266 N.J. Super. 573 (1993)
630 A.2d 355
JOHN M. SPEDICK, PLAINTIFF-APPELLANT,
v.
EMMA MURPHY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 4, 1993.
Decided July 29, 1993.
*577 Before MICHELS and WALLACE, JJ.
*578 Albert M. Stark, for plaintiff-appellant (Stark & Stark, attorneys; Bruce H. Stern, of counsel and on the brief).
William F. Hartigan, Jr., for defendant-respondent (McLaughlin & Cooper, attorneys; James J. McLaughlin, of counsel; Mr. Hartigan, on the brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
This is a protracted personal injury automobile negligence action. Plaintiff John Spedick presently appeals from a judgment of the Law Division which was entered in favor of defendant Emma Murphy on a molded jury verdict that had concluded that there existed no cause for action. He also appeals from a post-judgment order denying his motion for a new trial as to damages only.
Plaintiff, a forty-six-year-old podiatrist, instituted this action against defendant to recover damages for personal injuries he allegedly sustained as a result of an automobile accident that occurred on Quakerbridge Road in West Windsor, New Jersey on August 30, 1985. The proofs in this lengthy trial established that plaintiff was operating a 1972 nine-passenger Buick station wagon, which he characterized as a "big heavy car." Plaintiff stopped for a traffic light on Quakerbridge Road at its intersection with Clarksville Road. According to plaintiff, he heard a loud noise and felt movement in the rear of his automobile. He then felt a "sharp pain in his back  upper back, or lower neck, some pain anyway, sharp." He testified that then "everything went out, or white, or grey or like white grey," and the next thing he remembered was that "some guy was banging on [his] window." The investigating police officer testified that when he arrived on the scene, plaintiff was complaining of neck pain, but never indicated that he had lost consciousness, because had plaintiff done so he would have called for an ambulance.
*579 Defendant, who was operating a 1980 Oldsmobile, testified that she also was travelling on Quakerbridge Road, and as she approached the intersection where plaintiff's automobile was stopped, she applied her brakes. Before her automobile came to a complete stop, the traffic light turned green and she struck the rear of plaintiff's automobile. The front bumper of defendant's automobile struck the trailer hitch on plaintiff's automobile. When she struck the rear of plaintiff's automobile, her daughter, who was riding in the passenger seat, was thrown forward against the windshield, cracking it with her head. The parties drove their automobiles off of the roadway. Other than the cracked windshield, defendant's automobile suffered only "scrapes on the front bumper."
Later that day, plaintiff's wife took him to the emergency room at Hamilton Hospital. Plaintiff complained of dizziness and neck and shoulder pain. He also said that his "left arm was hanging down ... [and not] working very well." X-rays indicated that plaintiff's skull and cervical spine were normal, save for degenerative arthritic changes on the left side at levels C5-6 and C6-7. Plaintiff denied having any blurred vision. The physician examining him found that he was stable, and diagnosed a probable concussion and cervical sprain. He was discharged the very same day.
Dr. Francis Pizzi, a board-certified neurological surgeon, first saw plaintiff on September 3, 1985. Plaintiff told Dr. Pizzi that he had been "stunned" by the accident, but that he had not lost consciousness. Plaintiff complained of pain between his shoulder blades, and discomfort in moving his left arm. Although he had a full range of motion in his neck, plaintiff had neck discomfort upon forcible extension, and tenderness in his neck and back muscles. Dr. Pizzi diagnosed plaintiff to be suffering from the residuals of a flexion-extension injury, along with a concussion of the inner ear structure, and he felt that these problems were the cause of the dizziness of which plaintiff complained. Dr. Pizzi examined plaintiff again on October 1, 1985, at which time plaintiff complained of *580 double vision, but no neck pain or memory problems. At that examination, Dr. Pizzi recommended that plaintiff see an ophthalmologist, and concluded that as of that date plaintiff had no injuries of a neurosurgical nature.
On September 9, 1985, plaintiff presented to Dr. Sporn, an orthopedist, complaining of left shoulder pain. Dr. Sporn diagnosed plaintiff to be suffering from tendinitis and a contusion of the shoulder. However, an arthrogram was negative regarding ligament damage and rotator cuff tear.
Subsequently, on September 30, 1985, Dr. John Vester, a board-certified neurologist, examined plaintiff because of plaintiff's complaints of double vision. Plaintiff told the doctor that he was seeing double in "every range" or, in other words, in every area of vision tested. According to Dr. Vester, this complaint was "difficult to explain," inasmuch as it was not a "typical pattern[] after [a] head or neck trauma." Dr. Vester was of the opinion that plaintiff had probably suffered a "flexion-extension [injury,]" which would likely "quiet down" in time. He attributed any double vision that plaintiff was having to an eye inflammation from the initial accident, a hemorrhage, or a reaction to an antibiotic. Shortly thereafter, plaintiff saw an ophthalmologist at Wills Eye Hospital in October of 1985. This doctor tested plaintiff's optic nerve, and found it to be normal.
In January of 1986, approximately half a year after the accident, plaintiff saw Dr. Charuk, a neuropsychologist, who recommended biofeedback therapy. However, plaintiff discontinued such therapy after only two visits. One of the psychological tests which Dr. Charuk administered to plaintiff was the Halsted/Retan battery, which gauges brain damage. The tests results revealed that plaintiff scored "well within the normal range."
In January of 1987, almost one-and-one-half years after the accident, plaintiff presented to Dr. John Gordon, a clinical psychologist specializing in neuropsychology. Dr. Charuk had recommended Dr. Gordon to plaintiff almost a year earlier. Like Dr. Charuk, Dr. Gordon administered various psychological tests, *581 including the Halsted/Retan battery. While Dr. Gordon found plaintiff to be above average in intellect and communication ability, he concluded that plaintiff was having difficulty remembering new information and performing tasks which required attention or concentration. Dr. Gordon's diagnosis was that plaintiff had suffered organic brain syndrome as the result of a head injury. According to Dr. Gordon, such injuries cannot be identified by medical experts or diagnosed with traditional techniques. Over a period of five years Dr. Gordon treated plaintiff with respect to his problems in a manner that Dr. Gordon described as "working together as one person."
Plaintiff was also treated and examined by numerous other physicians. For instance, on March 20, 1990, plaintiff was examined by Dr. Allen Zechowy, a board-certified neurologist to whom he had been referred by Dr. Gordon. Dr. Zechowy was of the opinion that plaintiff had sustained a brain injury, causing cognitive defects in attention, concentration and memory, as well as orthopedic and neurological injuries to his neck and upper extremities as a result of the accident. Dr. Zechowy was also of the opinion that plaintiff was permanently disabled due to his injuries, and thus, could no longer function in his chosen profession of podiatry.
Between February of 1987 and December of 1988, plaintiff was examined six times by Dr. John Esterhai, a board-certified orthopedic surgeon, who diagnosed plaintiff as having sustained a post-traumatic cervical radiculopathy  irritation of the nerves in the neck  and shoulder impingement syndrome. Dr. Esterhai was also of the opinion that plaintiff could no longer engage in his professional occupation. However, Dr. Esterhai acknowledged that from 1988 forward, plaintiff was able to bench press, swim and walk regularly without experiencing any left shoulder or arm pain.
Dr. Thomas Kay, a neuropsychologist, examined plaintiff in 1991 and diagnosed him as having a minor traumatic brain injury. Dr. Kay was of the opinion that plaintiff's inability to maintain proper *582 alertness and remain organized in dealing with individual patients and business records would interfere with his ability to carry out his podiatry practice. With respect to this practice, plaintiff testified that in 1986, the year after the accident, he treated patients on 2,669 occasions at his office. While plaintiff maintained that his left shoulder was causing him pain and that he was having cognitive problems, he did not seek any medical assistance, with the exception of two visits to a neuropsychologist, for the entire period from October 1985 to January 1987. Later on, plaintiff claims to have developed problems remembering patients' names, and to have cut his practice back to only "simple" cases. The number of operations that he performed on patients declined steadily from twenty-eight in 1984, to fourteen in 1985, to seven in 1986, to only one in 1987. Plaintiff finally stopped taking new patients and, in July of 1989, closed his practice entirely.
Plaintiff was also examined and evaluated by several physicians at the behest of defendant. Dr. Thomas Urbaniak, a board-certified orthopedist, who examined plaintiff on July 1, 1987, was of the opinion that because no shoulder impingement had shown up on the MRI performed eighteen months after the accident, plaintiff had not suffered a permanent orthopedic injury to his left shoulder. He also was of the opinion that plaintiff's neck, cervical spine and right arm showed no objective signs of injury. Dr. Urbaniak concluded that plaintiff's full range of motion would allow him to perform his duties as a podiatrist, although he recognized that the EMG reports of some of the other doctors appeared to indicate that plaintiff had some type of nerve root problems relating to C7 on the left side, and that plaintiff might experience pain therefrom for the rest of his life.
Dr. Walter Scheuerman, a board-certified neurosurgeon, examined plaintiff on April 6, 1988. Dr. Scheuerman reviewed the medical reports of several doctors involved, and also made an independent evaluation of plaintiff. Dr. Scheuerman was of the opinion that plaintiff had a full range of motion in his shoulder and back, and that he had suffered no nerve injury. Dr. Scheuerman *583 also was of the opinion that plaintiff had no neurological injury to the brain, even though he conceded that plaintiff had complained of pain in his shoulder and short-term memory loss.
Similarly, Dr. Harold Byron, a psychiatrist, examined plaintiff on March 20, 1989 and found that, although plaintiff may have suffered a concussion at the time of the accident, he had no lasting impairment of his cortical function and no permanent injury to his brain function. Dr. Byron was of the opinion that plaintiff could continue to perform in the podiatry profession.
On April 12, 1990, Dr. Edward Murphy, the Director of Rehabilitational Psychology at Sacred Heart Hospital, examined plaintiff and found, primarily as a result of his administration of the Halsted/Retan battery, that plaintiff had no closed head injury with any permanent cognitive deficit. Dr. Murphy was of the opinion that from a neuropsychological perspective, plaintiff had not lost his ability to work in his profession. According to Dr. Murphy, any residuals that plaintiff was suffering from were emotional and not organic in nature. Dr. Murphy described plaintiff to be suffering from a post-traumatic disorder where he showed neurological symptoms based on problems he had dealing emotionally with people telling him he should not continue to work, as well as other anxieties and depressions.
Finally, Dr. Ralph Retan, who developed the Halsted/Retan battery, reviewed the neuropsychological test data garnered by Drs. Charuk, Gordon and Murphy, and concluded that plaintiff was not suffering from the residuals of any brain injury. According to Dr. Retan, to the extent that other doctors had drawn different conclusions from the same test results, he was satisfied that they had over-interpreted the test results. Further, Dr. Retan was of the opinion that plaintiff could work in his chosen profession, and he pointed to a comparison between plaintiff and a test group of 156 high-level scientists, physicians and executives where he concluded that plaintiff was functioning at almost exactly the same level as the test group.
*584 On March 20, 1992, at the conclusion of the proofs, the jury found, in response to a special interrogatory, that plaintiff had not sustained any damages. The trial court immediately molded the jury verdict, and thereupon entered judgment in favor of defendant for no cause for action. On March 27, 1992, plaintiff filed a motion for a new trial as to damages only with the trial court. He claimed that the jury verdict of "no damages" was clearly against the weight of the evidence, and constituted a clear and convincing miscarriage of justice under the law. Although the motion was filed with the trial court on March 27, 1992, defendant was not served with the motion papers until April 6, 1992. Moreover, the copy of the motion papers received by defendant's attorney bore a date stamp of March 31, 1992 from the postage meter of plaintiff's attorney.
Following a two-day hearing on the motion, the trial court found that the jury verdict was shocking and contrary to the evidence, and that it would have granted a new trial but for the failure of plaintiff to serve the motion upon defendant within the ten days required by R. 4:49-1. The trial court specifically found that plaintiff had failed to strictly comply with the ten-day rule. Additionally, the trial court found that plaintiff had not even substantially complied with the time service requirements under the principles discussed in Stegmeier v. St. Elizabeth Hosp., 239 N.J. Super. 475, 571 A.2d 1006 (App.Div. 1990). Plaintiff appeals.
Plaintiff seeks a reversal of the judgment and order denying his motion for a new trial on damages only. He contends that the trial court committed numerous errors, the accumulation of which created a result so unfair as to require a reversal and a new trial on the sole issue of damages. Specifically, plaintiff argues that (1) the trial court erred by admitting into evidence photographs of defendant's automobile because they did not truly represent the condition of the automobile immediately following the accident, and it compounded this error by failing to require defendant to produce expert testimony correlating the extent of the damage to the automobile with plaintiff's injuries; (2) the trial court erred in *585 permitting defendant to call his initial treating physicians to testify; (3) the trial court erred in permitting Dr. Urbaniak to testify beyond the scope of his reports; (4) statements made by defense counsel in summation were so prejudicial as to require a new trial; (5) the trial court erred in failing to charge that medical malpractice was not an intervening factor; (6) the special interrogatory submitted to the jury was improper, and finally (7) he complied with the time requirements of R. 4:49-1, if not actually, at least substantially. We have carefully considered the record and the arguments presented, and we are satisfied that the trial court properly denied plaintiff's motion for a new trial on the issue of damages because plaintiff failed to timely serve the motion upon defendant as required by R. 4:49-1. Beyond this, all of the other issues of law raised are clearly without merit. R. 2:11-3(e)(1)(E). Further comment, however, is appropriate with respect to some of plaintiff's contentions.

I.
The pivotal issue on this appeal is whether the trial court properly denied plaintiff's motion for a new trial as to damages on the ground that the motion was not served within the ten-day period mandated by R. 4:49-1(b). The jury returned its verdict awarding no damages on March 20, 1992. On that same day, the trial court molded the jury verdict, and entered judgment in favor of defendant for no cause for action. On March 27, 1992, seven days after the verdict, plaintiff's attorney completed his motion papers for a new trial on damages, and arranged for an employee of his law firm to file the original motion papers with the trial court. Also on that day, plaintiff's attorney directed his secretary and his paralegal to serve by regular mail, and also to hand deliver, copies of the motion papers to defendant's attorney. Later that day, plaintiff's attorney asked his secretary if copies of the motion papers had been mailed to defendant's attorney, and he was told that they had been so mailed. Plaintiff's attorney then checked the out-going mail tray on his secretary's desk, and did *586 not see copies of the motion papers that were to be served upon defendant. The secretary told plaintiff's attorney that the firm's mail courier had already picked the papers up.
On April 7, 1992, defendant's attorney called plaintiff's attorney and informed him that he had only received the notice of motion for a new trial the day before, April 6, 1992. Notwithstanding plaintiff's attorney's claim that his in-house mail courier had picked up the motion papers from the firm's mail tray on March 27, 1992, the copy which defendant's attorney eventually received on April 6, 1992 bore a March 31, 1992 date stamp from plaintiff's attorney's postage meter. Moreover, the envelope which contained the motion papers did not have a United States Postal Service cancellation date or post mark on it at all.
The trial court held that under our court rules the time requirement for serving new trial motions under R. 4:49-1(b) was to be strictly complied with, and that plaintiff's motion had not been served within the required time. The trial court specifically found that plaintiff's attorney's mail courier was a firm employee who was under plaintiff's attorney's control, and also that plaintiff's attorney could have, and should have, followed up to make sure that the motion papers had been placed in the mail by the firm's courier on March 27, 1992. With regard to the latter, the trial court indicated that plaintiff's attorney could have followed up on his instructions to have the copies of the motion papers hand-delivered to defendant's attorney, or could have called defendant's attorney directly prior to March 31, 1992 in order to determine if he had received the concerned motion papers. Finally, the trial court noted plaintiff's attorney's failure to reasonably explain why the papers had not been timely served.
R. 4:49-1(b), which establishes the time requirements for the serving of a motion for a new trial, provides:
A motion for a new trial shall be served not later than 10 days after the court's conclusions are announced in non-jury actions or after the return of the verdict of the jury. The motion shall be noticed for hearing and argued no later than the second regular motion day following the service thereof, unless the court for good cause shown orders the hearing fixed for either an earlier or a later date. The *587 opposing party may, within 5 days after service of the motion, serve a cross-motion for a new trial returnable at the same time and place as the motion. If a motion for a new trial is based upon affidavits they shall be served with the motion; opposing affidavits shall be served within 10 days thereafter which period may be extended for an additional period not exceeding 20 days either by written stipulation of the parties or court order. The court may permit reply affidavits. Except in special circumstances the motion shall be decided by the judge on his trial notes without awaiting a transcript of the testimony.
R. 4:49-1(b) plainly requires that a party must serve a motion for a new trial not later than ten days after the return of the jury's verdict. Historically, our courts have strictly construed R. 4:49-1(b), and denied new trial motions not served within the required ten-day period. See, e.g., Baumann v. Marinaro, 95 N.J. 380, 387-88, 471 A.2d 395 (1984) (motion for a new trial denied where it was neither filed nor mailed until the sixteenth day after the jury's verdict); Cabrera v. Tronolone, 205 N.J. Super. 268, 270, 500 A.2d 755 (App.Div. 1985), certif. denied, 103 N.J. 493, 511 A.2d 666 (1986) (motion for new trial denied as untimely where the defendants filed their motion on the tenth day, but did not give a copy to a delivery service for hand delivery to their adversary until the thirteenth day); Moich v. Passaic Terminal & Transp. Co., Inc., 82 N.J. Super. 353, 364, 197 A.2d 690 (App.Div. 1964) (trial court properly denied a motion for a new trial where the motion was timely filed on the sixth day following the jury's verdict, and a copy of the papers was timely delivered to an independent messenger service on that same day, but the copy was not actually delivered until the fifteenth day). See also Pressler, Current N.J. Court Rules, comment 2 on R. 4:49-1 (1993), where the nonrelaxability of the strict time requirements of the rule are expressly recognized:
It is clear that where trial is by a jury, the period begins to run from the date the verdict is received in open court (see R. 1:8-9) and not from the date judgment is entered on the docket pursuant to R. 4:47. See Gussin v. Grossman, 66 N.J. Super. 107, 168 A.2d 457 (Law Div. 1961). As the ten-day period is made nonrelaxable, even in extenuating circumstances, by R. 1:3-4(c), a late service cannot be cured by a nunc pro tunc order. Moich v. Passaic Terminal & Transportation Co., Inc., 82 N.J. Super. 353, 197 A.2d 690 (App.Div. 1964). And see generally as to non-relaxability, Baumann v. Marinaro, 95 N.J. 380, 471 A.2d 395 (1984); Jonax v. Allstate Ins. Co., 244 N.J. Super. 487, 582 A.2d 1050 (Law Div. 1990). See also Cabrera v. Tronolone, 205 N.J. Super. 268, 500 A.2d 755 (App.Div. 1985), certif. den. *588 103 N.J. 493, 511 A.2d 666 (1986), holding that while posting on the tenth day will effect timely service, delivery after the tenth day to a messenger service for next-day hand delivery will not. But see Stegmeier v. St. Elizabeth Hosp., 239 N.J. Super. 475, 571 A.2d 1006 (App.Div. 1990), holding that delivery to a messenger service within the ten-day period constitutes substantial compliance with the rule's time prescription for service even if service is not effected until after the ten-day period.
In view of the clear and unambiguous language of R. 4:49-1(b), our Supreme Court's decision in Baumann v. Marinaro, supra, and our own decisions in Cabrera v. Tronolone, supra, and Moich v. Passaic Terminal & Transp. Co., Inc., supra, we are convinced that the trial court properly denied plaintiff's motion for a new trial. Plaintiff clearly failed to serve the motion for a new trial upon defendant within ten days after the return of the jury verdict. Thus, his request for a new trial was, and is, time barred under our court rules.
Furthermore, contrary to plaintiff's claim, Stegmeier v. St. Elizabeth's Hosp., supra, is factually distinguishable from the case at bar, and thus, does not compel a different result. Even assuming that timely delivery of a motion for a new trial to a reputable independent delivery service within the ten-day period may constitute substantial compliance where there is only a short delay in the actual delivery by the independent service, pursuant to the principles discussed in Stegmeier, such was not the case here. First, the mail courier in this case was an employee of plaintiff's attorney's law firm. The mail courier was not an independent delivery service. Contrary to plaintiff's argument, an in-house courier is not "virtually as independent" as the independent delivery service utilized in Stegmeier, supra. A law firm's in-house courier is no more independent than the law firm's lawyers, paralegals, secretaries or other employees, whose errors and omissions are properly the responsibility of the law firm. A law firm, whether large or small, which chooses to use an in-house mail courier should not, and does not, enjoy any greater flexibility from court rules than any other practitioner.
Second, we reject plaintiff's argument that it may be safely assumed that his motion papers were timely served based on *589 affidavits and certifications stating that the envelope containing the motion papers was mailed on March 27 or March 30, but only stamped March 31 due to an error in the stamping of the envelope at plaintiff's law firm. We also reject plaintiff's claims that the stamp meter was either wrongly advanced to March 31, instead of March 30, following the weekend, or that the envelope was advance stamped with other mass billings consistent with office policy. Quite frankly, none of the affidavits satisfactorily explains when the envelope was mailed, or why it was postage stamped March 31, if in fact it was not mailed on March 31. Plaintiff's claims in this regard are simply unsupported by the facts and, therefore, they constitute nothing more than sheer speculation. In contrast, defendant's claims that the envelope which was postage stamped March 31, 1992 could not have been mailed prior to that date are convincing. The record reveals that the United States Post Office does not accept mail which is stamped with a date that is earlier than the actual date upon which the post office receives it. Thus, if an envelope bearing a March 31 postage date had been attempted to be mailed before March 31, the post office would have rejected it. In sum, the evidence points, as the trial court aptly determined, to the inevitable conclusion that plaintiff's motion for a new trial was actually mailed, at the very earliest, on March 31, the date stamped on the envelope and, thus, was not timely served in accordance with the requirements of R. 4:49-1(b).
Beyond this, even if it could be argued that there was substantial compliance similar to that in Stegmeier, supra, an argument which the trial court rejected, and which rejection we now affirm, we would not follow the holding in that case. In our view, the holding in Stegmeier, supra, is contrary to the clear and unambiguous language of R. 4:49-1(b), and contravenes the principles set forth by our Supreme Court in Baumann v. Marinaro, supra, and our own decisions in Cabrera v. Tronolone, supra, and Moich v. Passaic Terminal & Transp. Co., Inc., supra. In short, we do not agree with Stegmeier v. St. Elizabeth's Hosp., supra.
*590 Accordingly, we affirm the order of the Law Division denying plaintiff's motion for a new trial as to damages. This affirmance is based substantially on the reasons expressed by Judge Yaskin in her oral opinion of May 26, 1992.

II.
Prior to the commencement of the trial, plaintiff objected to the admission into evidence of two photographs of defendant's automobile. Plaintiff argued that the photographs, which were taken some six years after the accident, were inadmissible because they showed the automobile with a new windshield, whereas the parties agreed that at the time of the accident, the windshield had been cracked due to defendant's daughter's head having collided with it upon impact. Defendant testified that the photographs accurately showed the condition of her automobile at the time of the accident, with the exception that the cracked windshield had been replaced. Defendant marked the windshield in the photographs with a red crayon, and explained to the jury that the "x's" indicated where the windshield had been cracked when her daughter hit her head. Defendant also testified that, other than the windshield, there was no damage to the front of her automobile as a result of the accident. Thus, the fact that six-and-a-half years may have passed between the date of the accident and the time that the pictures were taken is irrelevant. The photographs, as explained, fairly and accurately depicted the condition of the automobile immediately following the accident, and thus, were properly admitted into evidence. See Garafola v. Rosecliff Realty Co., Inc., 24 N.J. Super. 28, 42, 93 A.2d 608 (App.Div. 1952).
We are also satisfied that the trial court properly permitted defendant to argue in summation that the jurors could infer from the photographs that plaintiff simply could not have been as seriously injured as he claimed to be as a result of the impact. It is fundamental that counsel may argue from the evidence any conclusion which a jury is free to arrive at. Counsel may draw conclusions even if the inferences that the jury is asked to make *591 are improbable, perhaps illogical, erroneous or even absurd, unless they are couched in language transcending the bounds of legitimate argument, or there are no grounds for them in the evidence. See Wimberly v. Paterson, 75 N.J. Super. 584, 604, 183 A.2d 691 (App.Div.), certif. denied, 38 N.J. 340, 184 A.2d 652 (1962); Botta v. Brunner, 42 N.J. Super. 95, 108, 126 A.2d 32 (App.Div. 1956), modified, 26 N.J. 82, 138 A.2d 713 (1958). Here, the jury heard testimony from both plaintiff and defendant describing the impact. The physical damage to the two automobiles, as testified to by the police officer and the parties, corroborated the fact that this was a minor automobile collision. It was, therefore, entirely proper for defendant to comment on the photographs, and to argue the inferences to be drawn therefrom, in an effort to refute plaintiff's experts' medical testimony as to the seriousness and permanency of the injuries he had sustained.

III.
Plaintiff also contends that the trial court erred by permitting defendant to offer the testimony of Dr. Pizzi and Dr. Vester, who had treated plaintiff early on for his injuries, but who plaintiff did not intend to call as witnesses. Prior to trial, the trial court ruled that defendant could call Dr. Pizzi and Dr. Vester, and each would be allowed to testify as to information about plaintiff's complaints, his medical history, and their physical examinations and diagnoses. The trial court, however, precluded these physicians from testifying as to their prognoses.
It is clear that our court rules permit discovery of the opinion of a non-testifying expert whom another party had retained or employed "in anticipation of litigation or preparation for trial" only upon a showing of "exceptional circumstances." R. 4:10-2(d)(3). An inherent conflict exists in such cases between the policy favoring the winnowing out of the truth from whatever reliable sources, and the "unavoidable element of unfairness" which exists in admitting expert opinion evidence which is based on information the expert obtained from a party as part of a *592 confidential relationship, and which evidence that party does not want introduced. Graham v. Gielchinsky, 126 N.J. 361, 371-73, 599 A.2d 149 (1991). In Graham, supra, our Supreme Court reexamined this conflict and held that because "effective cross-examination of [expert] witnesses is inherently limited, [the] truth has a better chance to emerge if the use of an adversary's expert is the exception, not the rule." Id. at 373, 599 A.2d 149. The Court then went on to hold that, in the absence of "exceptional circumstances," courts should not allow the opinion testimony of an expert originally consulted by an adversary. Ibid.
Here, however, we are not dealing with medical experts who were consulted by plaintiff for the purpose of rendering an opinion about the severity or permanency of his injuries in anticipation of, or in preparation for, litigation. Rather, we are dealing with two physicians, Dr. Pizzi and Dr. Vester, who plaintiff first consulted for treatment shortly after the accident. Plaintiff never intended to call these doctors as witnesses. Defendant, therefore, was properly permitted to call these witnesses, not to obtain opinions about plaintiff's disabilities, but to testify concerning their physical examinations and diagnoses of plaintiff shortly after the injury. This testimony was clearly relevant and material. To bar such testimony of the initial treating physicians would only serve to hinder the search for truth. Such a result cannot, and will not, be sanctioned by this court, particularly in a case of this kind, where a relatively minor automobile accident is claimed to have caused serious and permanent injury, and resulted in the inability to practice a profession.
Beyond this, it appears from the colloquy between the trial court and the trial attorneys that plaintiff essentially agreed to permit defendant to call Dr. Pizzi and Dr. Vester, and question them with respect to the findings, including diagnoses, that they had made during their examinations of plaintiff. Thus, even assuming that an error was committed when the trial court allowed the limited testimony of Dr. Pizzi and Dr. Vester, such an error cannot serve as the basis for a reversal of the judgment *593 here. A party who consents to, acquiesces in, or encourages an error cannot use that error as the basis for an objection on appeal. State v. Harper, 128 N.J. Super. 270, 276-77, 319 A.2d 771 (App. Div.), certif. denied, 65 N.J. 574, 325 A.2d 708 (1974). In sum, the trial court properly admitted the testimony of these two doctors.

IV.
Plaintiff further contends that the trial court erred in permitting Dr. Urbaniak to testify beyond the scope of his two reports. He maintains that defendant purposely examined Dr. Urbaniak during his de bene esse deposition in an effort to get information before the jury which exceeded that given by the doctor during the previous discovery, including his prior reports. We disagree.
Dr. Urbaniak examined plaintiff on July 1, 1987. Plaintiff received a copy of the doctor's July 28, 1987 report in which he diagnosed a flexion-extension injury to the cervical spine, but opined that there was no permanent disability in plaintiff's left shoulder. Dr. Urbaniak based his opinion that plaintiff had a medical disability in the cervical spine on the results of an EMG which had been performed by Dr. Jennifer Chu, as well as certain nerve condition studies that had been done on May 20, 1987. Thereafter, plaintiff forwarded the results of a November 1987 follow-up EMG which Dr. Urbaniak reviewed. On February 9, 1988, Dr. Urbaniak issued a second report in which he compared the two EMG results, and suggested that they be reviewed by a neurological specialist. Dr. Urbaniak was of the opinion that the two EMG results were "somewhat confusing" in that they diagnosed different injuries, but he did acknowledge that both reports revealed involvement of the C7 root, and that it appeared that the patient certainly had some type of nerve root problem. Subsequently, in June of 1990, plaintiff deposed Dr. Urbaniak at which time he completed a prognosis question sheet wherein Dr. Urbaniak indicated that, although plaintiff might still be experiencing pain, that pain would not keep him from performing his profession.
*594 On February 19, 1992, because Dr. Urbaniak would be unavailable for trial, the parties took his videotaped deposition de bene esse. Plaintiff's attorney learned that Dr. Urbaniak had been shown Dr. Scheuerman's report, and he objected to Dr. Urbaniak's expressing an opinion as to whether Dr. Scheuerman's report changed his earlier conclusion regarding whether or not plaintiff's injury would keep him from performing his profession. Dr. Urbaniak testified that the report did not change his prognosis. At trial, plaintiff attempted to bar Dr. Urbaniak's testimony as to Dr. Scheuerman's report. The trial court held that the testimony was admissible, and that plaintiff was not prejudiced inasmuch as he knew from Dr. Urbaniak's second report that Dr. Urbaniak had requested, and desired, a neurological study in order to resolve the discrepancy between the EMG test results. The trial court also noted that all Dr. Urbaniak was testifying to was that, based on Dr. Scheuerman's report, he agreed with the second EMG report. The trial court also noted that, although defendant may have violated discovery rules by not giving plaintiff advance notice that Dr. Urbaniak had seen Dr. Scheuerman's report, exclusion of his testimony would not be proper, and that plaintiff still had the opportunity to refute the second EMG report with the prior EMG report prepared by Dr. Chu. Notably, the trial court afforded plaintiff the opportunity to question Dr. Urbaniak on these reports prior to trial, but plaintiff never availed himself of that offer.
There is nothing in this record to suggest that defendant intended to mislead plaintiff by not updating him on Dr. Urbaniak's viewing of Dr. Scheuerman's report. Dr. Urbaniak had already told plaintiff, by responding to plaintiff's own form, that he did not think that plaintiff's injury was career ending and thus, there was no surprise. Nor was plaintiff unfairly prejudiced by the challenged testimony.
In the circumstances, the trial court did not mistakenly exercise its discretion in admitting into evidence the challenged portion of Dr. Urbaniak's testimony.

*595 V.
We are also satisfied that defendant did not exceed the bounds of fair comment or propriety in his summation by referring to plaintiff's boxing history or marital problems. Plaintiff argues that the summation breached the parties' stipulation that plaintiff had no preexisting injuries to his cognitive functions.
First, we are satisfied that the comment during summation that plaintiff had been a boxer was not harmful. The jury was already aware of this information, and it was further told that the evidence did not support an inference of a prior cognitive defect. Moreover, defendant stressed that he was not actually claiming that plaintiff had been injured as a boxer, but only that he wanted the jury to consider that plaintiff had prior experience with impacts, thereby implying that the impact from the automobile collision here would be inconsequential to someone who had previously handled the impacts associated with boxing. Secondly, defendant's comment concerning plaintiff's matrimonial difficulties was also not harmful. The fact that plaintiff was going through a separation and divorce while he was being treated was also clearly in the record. Based on Dr. Murphy's testimony about anxiety and depression affecting plaintiff's post-traumatic neurological injury, the jury could reasonably have inferred that these other life crises were causing, or adding to, plaintiff's neurological injury and disability.
In sum, defendant did not exceed the scope of the stipulation entered into with plaintiff as to these issues. Nor did she exceed the bounds of legitimate argument and fair comment.

VI.
Plaintiff also assigns as error the trial court's refusal to charge the jury that medical malpractice was not an intervening factor which would relieve defendant of responsibility for his injuries. Plaintiff claims that one plausible way to explain the "no damage" verdict is to understand the jury's finding in light of *596 defendant's expert's testimony to the effect that his (plaintiff's) psychological injuries were caused by his own doctors telling him that he could not return to work. Plaintiff argues that this was tantamount to defendant blaming plaintiff's injuries on the negligence or malpractice of his own doctors, and that by not charging the jury as he had requested on intervening medical negligence, the trial court allowed the jury to sidestep a finding that defendant's act was the proximate cause of his injuries. We disagree.
Dr. Murphy testified on direct examination that while plaintiff's anxiety and depression were initially "post-traumatic" in nature, that is, caused in part by plaintiff's reaction to the accident, by the time of trial they were "the direct consequence of being told that he is unable to function." The doctor further indicated that "it's a travesty ... that this man is not being allowed to go back to work." Dr. Murphy was of the opinion that while plaintiff was "trying to follow [as] best he can his doctor's advice in terms of not going [to work]," that circumstance was distressing him more than anything else. Later, the doctor repeated his previously-stated belief that at the time of trial plaintiff's "post-traumatic" psychological or neurological injury would have, and should have, been resolved "were it not for the fact that ... [plaintiff had] not been allowed to return to work."
During conference with the trial court concerning the framing of the jury charge, plaintiff's counsel referred to Dr. Murphy's earlier testimony about plaintiff's not being permitted to return to work, and asserted that Dr. Murphy's opinion amounted to an allegation of medical malpractice as the cause of plaintiff's neurological injuries. The trial court observed that Dr. Murphy had clearly opined that the origin of plaintiff's neurological injury was his reaction to the accident. Nonetheless, in order to accommodate plaintiff, the trial court ruled that it would word the charge to reflect that defendant was responsible for all injuries proximately caused by the accident. The trial court reasoned that such a charge would obviate the need to explain to the jury that even if plaintiff's doctors' treatment had aggravated plaintiff's injury, *597 defendant should still be held responsible. Thus, the trial court charged the jury by explaining that defendant was responsible for all of plaintiff's "psychological" or "physical" injuries that had been "proximately brought about by the accident," and it also thoroughly and properly defined "proximate cause."
Reviewing the charge as a whole, we are satisfied that the trial court correctly declined to instruct the jury that medical malpractice was not an intervening factor which would relieve defendant of responsibility. First, Dr. Murphy's testimony cannot be taken as indicating that plaintiff's doctors were the cause of plaintiff's neurological difficulties. Rather, Dr. Murphy's testimony shows only that he disagreed with plaintiff's doctors' recommendation that plaintiff should not work, and that if that obstacle were removed, plaintiff would recover fully. In other words, Dr. Murphy accused plaintiff's doctors not of causing plaintiff's emotional state, but of failing to put him on the road to recovery. Second, through its careful and thorough definition of "proximate cause," the trial court made it abundantly clear that even if the jury did believe that plaintiff's doctors had further injured him, it was still obligated to find against defendant.
The requested charge on medical malpractice plainly was not necessary. The actual charge which was given, when read as a whole, fully and correctly explained to the jury the applicable legal principles that were to govern its deliberations.

VII.
Finally, we are convinced that the trial court properly submitted the following special interrogatory to the jury:
[I]f you have found [that] the plaintiff was injured and that the accident which occurred on August 30th 1985 was a proximate cause of that injury or injuries, what damages do you award the plaintiff?
Plaintiff challenges this special interrogatory as being improper. We do not agree. We are entirely satisfied that the special interrogatory was appropriate. Under R. 4:39-2, the trial court may submit to the jury written interrogatories upon one or *598 more issues of fact which are necessary to the verdict. The purpose of these special interrogatories is to ensure consistency with the verdict, and to isolate potential error. See Nylander v. Rogers, 41 N.J. 236, 240, 196 A.2d 1 (1963). Written interrogatories may be used at the trial court's discretion. Nylander v. Rogers, supra, 41 N.J. at 239, 196 A.2d 1. Here, the trial court properly exercised its discretion in submitting the challenged interrogatory to the jury to assist it in reaching a verdict.
Additionally, the challenged interrogatory was not prejudicially worded. This interrogatory expressly set forth that the jury was to determine the amount of damages that plaintiff was entitled to if it found that plaintiff had been injured as a proximate result of the accident. Since defendant contested plaintiff's injuries, the jury had to decide whether he had in fact been injured, and, if so, the nature and extent of his injuries, as well as the amount of damages necessary to compensate him for those injuries. That is simply what this interrogatory required. Nothing more, nothing less.
Finally, the written interrogatory only served to restate what the trial court had orally instructed. At trial, plaintiff did not object to this portion of the jury charge, or to the special interrogatory. In fact, the only objection that plaintiff did raise below in this regard was that the trial court refused to charge with respect to medical malpractice, as discussed above. Clearly, under such circumstances, plaintiff cannot now be heard to complain on this matter.

VIII.
Accordingly, the judgment and order denying plaintiff's motion for a new trial as to damages under review are affirmed.