# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1596-18T4

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

A.M.,

     Defendant,

and

K.B.,

     Defendant-Appellant.

_____

IN THE MATTER OF M.R. and S.B.,

     Minors.

_____

Submitted December 16, 2019 – Decided January 31, 2020

Before Judges Sabatino and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FN-04-0105-18.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Dana A. Citron, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Amy Melissa Young, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Rachel E. Seidman, Assistant Deputy Public Defender, on the brief).

PER CURIAM

K.B. (Kyle), the boyfriend of A.M. (Annie), appeals from a Family Part determination that he abused or neglected Annie's five-year old child M.R. (Mindy), and Annie and Kyle's infant son S.B. (Steven).[1] After a fact finding hearing, the court determined that Kyle's conduct on three distinct occasions "caused a very young child and a medically fragile newborn child to be placed at substantial risk of harm."

---

[1] We use pseudonyms for convenience of the reader and to protect the children's privacy. See R. 1:38-3(d)(12).

A-1596-18T4

On appeal, Kyle argues that there was insufficient evidence to support the trial court's finding of abuse and neglect and that the trial court abused its discretion by admitting into evidence photographs of Annie's injuries. The Law Guardian joins defendant in support of his appeal. Having carefully considered defendant's arguments in light of the record and the applicable legal principles, we reverse in part and vacate and remand in part, but affirm in part as to an appealed evidentiary ruling.

I.

The facts precipitating the three incidents are gleaned from the testimony and documentary evidence introduced at the fact finding proceeding. According to Sergeant John Field of the Pine Hill Borough Police Department, the first incident occurred on February 28, 2016 when an individual flagged down an officer to report an active domestic dispute at an apartment complex in the borough where a male individual, later identified as Kyle, forced his way into Annie's apartment. Initially, there was no answer when the officer knocked on the apartment door. The officers continued to announce their presence outside the apartment, which prompted Annie to finally open the door as additional officers arrived on scene.

A-1596-18T4

Annie told the officers that Kyle was not in the apartment and allowed them to check the premises. Contrary to Annie's assertion, however, the officers noticed Kyle's legs in the closet of Mindy's bedroom. According to Sergeant Field, while Mindy remained asleep in the bedroom, the officers "identif[ied] [themselves] as police officers[,] . . . grabbed each of [Kyle's] hands, . . . pulled him out, handcuffed him in the hallway, and took him to the living room." Annie then told officers that Kyle "wasn't supposed to be in the house," and that she "didn't know how he got into the house." The officers, nevertheless, arrested Kyle for "obstructing [their] investigation."

The facts of the second incident are discerned from the testimony of Pine Hill Police Officer Martin Brennan and Annie, as well as her recorded statement, and photographs of her injuries. Annie testified that sometime during the early morning on August 21, 2016, Kyle "started acting crazy and pushed [her] in the closet . . . saying that someone was attacking him." Annie indicated that Kyle was high "on something that's not liquor," but she could not readily identify what substance to which he was under the influence. She further stated that Kyle bit her in the back multiple times as he held her down on the floor of the closet. Annie initially stated at trial that Kyle "held [her] in the closet hostage for a couple of minutes." She later noted, however, that she "[did not] recall

how long [she was in the closet for], but it seemed like a while" and that it was "less than an hour." After she "struggled [her] way out and . . . opened the door," she proceeded to run to Mindy's room who was sleeping, grabbed her, left the house, and "hid behind the bushes in [her] apartment complex for like an hour."

On cross-examination, Annie stated that Mindy was awake while they were hiding but appeared fine because Annie told her they were "just playing hide and seek." After Annie reported the incident to police, she filed for a temporary restraining order against Kyle. According to Annie, Kyle made no threats towards Mindy or their unborn child, Steven, during the incident.

Officer Brennan testified that Annie walked into the Pine Hill Police Station to report the incident. In her recorded statement, Annie told police that Kyle "was tripping on . . . mollies" and that he "restrained [her] and he held [her in the closet] for like almost an hour and he said that [she] set him up, [she] was trying to kill him[,] and then he started biting [her, and] he started kicking [her]." Brennan testified that Annie had visible signs of injuries, including bruising on her left arm and abrasions on her neck, which he photographed.

At trial, Kyle's counsel objected to the photographs stating that the "photographs are totally irrelevant to anything to do with the children" and that they have "nothing to do with the condition of the children that evening." The

A-1596-18T4

Law Guardian also objected stating "there has been no testimony by either [Annie] or the officer that the children ever saw these bruises" and that the Division has to "demonstrate what the effect is on the children."

The facts of the third incident are discerned from the testimony of Sergeant Timothy McElroy and Annie, as well as a separate recorded statement and additional photographs. In her recorded statement to police taken on January 29, 2017, Annie indicated that while she was preparing a bottle for Steven in the kitchen early that morning, Kyle, who had been drinking, confronted her about him hearing her "moaning in the recording of [a] song." After telling Kyle that he was not making any sense, "he punched [her] in the face."

According to her statement, Kyle then "pulled out a knife" and "had [her] in [the] kitchen for . . . almost an hour just saying . . . things over and over, to tell him the truth about [the moaning he heard] recorded over a song." Annie told the police that "[t]here was blood all over the floor" and that she "was dripping blood" from her mouth and neck. Sergeant McElroy took photographs to document Annie's injuries, which were introduced into evidence again over Kyle's and the law guardian's objection.

Annie told Sergeant McElroy that Kyle "was holding [the knife] in his hand" and denied that he came at her or made any motions towards her with the knife. She further reported that Steven "needs medicine [at] certain hours" and that "he needed medicine at four o'clock and it was already like five [o'clock] . . . [when she] gave him his medicine."[2] Annie testified, however, that before the altercation, she "kept going back and forth" between the kitchen and Steven's room as she was "preparing milk for [him] . . . [and] giving [him] his medication." Annie also stated that after "certain things were going on" in the kitchen with Kyle, she put Steven down, but "had a baby monitor . . . and kept checking . . . on [him]."

In a January 24, 2018 order, the court found that Kyle "placed the children in imminent danger of a substantial risk of harm by depriving the children, including a medically fragile infant, of the only functioning reasonable caretaker on multiple occasions." The court further directed that Kyle be placed on the child abuse registry.

---

[2] A portion of the transcript of Annie's recorded statement provided in the record is noted as "indiscernible." Our restatement of Annie's comment that Steven "needed medicine at four o'clock and it was already like five [o'clock] . . . [when she] gave him his medicine" is based on our review of the same recorded statement considered by the trial court. See State v. S.S., 229 N.J. 360, 374 (2017).

A-1596-18T4

In its accompanying oral decision, the court found that Sergeant Field testified credibly with respect to the February 28, 2016 incident and based on his testimony, Kyle "essentially[] use[d] a sleeping child as a shield to hide from the police during a police investigation." The court also determined that Kyle "didn't think about the impact on [Mindy], if she suddenly woke up to find armed officers in her bedroom," or "the fear . . . she might have had if they had to draw their weapons." The court observed that it was fortunate that "there was not a physical altercation or guns fired as the three police officers entered [Mindy's] bedroom, found [Kyle] hiding in her closet, ordered him to come out . . . and arrested him."

With respect to the August 21, 2016 incident, the court relied on the testimony of both Officer Martin Brennan and Annie who the court found "testified credibly about the events of this day." The court accepted Annie's testimony that Kyle was "tripping on molly," "was agitated, paranoid, and appeared delusional" when he "kept [Annie] trapped [on] the closet floor for over an hour," "wrapped his legs around her so that she couldn't leave," "had his arms around her neck and chest," and "kept kicking her and biting her." The court emphasized that "[Annie's] testimony on the stand and her taped interview . . . were almost identical."

A-1596-18T4

The court also referenced the pictures Officer Brennan took after the incident indicating the "extensive bruises, red bite marks, and cuts throughout [Annie's] back and neck," and noted that Annie was able to escape "[a]fter an hour or more." The court concluded that "[Kyle's] actions in beating and trapping [Annie] on her closet floor caused [her] five-year-old to be without any care-giver for over an hour that evening," and that it was "undisputed that [Kyle] deprived [Annie's] five-year-old from having a functioning parent or care-giver."

As to the January 29, 2017 incident, the court based its findings on Annie's testimony, which it emphasized was, again, "almost identical to the statement that she gave . . . to the Pine Hill Police," as well as the testimony of Sergeant Timothy McElroy, who the court found "testified credibly" and whose "testimony was . . . not refuted."

The court first found that Steven, a "medically fragile infant" who had recently undergone hernia repair surgery, was present in the apartment during the event. Based on Annie's testimony, the court further found that Annie "attended to his extensive medical needs, which included having to be given medicine at specific times throughout the day and night." The court determined that Kyle "essentially kept her hostage for about an hour" when he "punched her

in the face with a closed fist with such force that she . . . still has a scar on her chin," and "pulled a knife on her and threatened to kill her." Annie "remained trapped in her kitchen in fear for her life" and "she was not able to give her son his medicine on time . . . as she was medically instructed to do" or feed him.

The court determined that "once again, [Kyle] removed the only functioning care-giver of [Annie's] five-year-old daughter and . . . for their medically fragile newborn son." It further found that "[b]oth very young children were, essentially, left home alone for at least an hour, including the premature newborn, who had just had surgery and was breathing with the assistance of an oxygen tank."

After noting that the defense failed to call any witnesses to dispute the three incidents, the court relied on N.J. Div. of Child Prot. & Permanency v. K.G., 445 N.J. Super. 324 (2016), and concluded that "children of such very young ages need a capable care-giver who can attend to them and to leave them or cause them to be without a functioning responsible care-giver places them at significant risk of harm." The court further reasoned that not only was Kyle "clearly unfit to care for anyone in [h]is paranoid, violent, and under the influence state," the children "were placed in substantial risk of harm by [Kyle] on these numerous occasions."

A-1596-18T4

Annie regained legal and physical custody of the children on July 24, 2018, and Kyle was awarded weekly supervised visits. The court terminated litigation on October 30, 2018 and ordered Kyle's visits to remain supervised. This appeal followed.

II.

We accord deference to the Family Part's fact-finding in part because of the court's "special jurisdiction and expertise in family matters." Cesare v. Cesare, 154 N.J. 394, 413 (1998). We uphold the court's fact findings if supported by sufficient, substantial, and credible evidence in the record. N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007). We defer to a trial court's factual findings because the judge has had the opportunity to observe witnesses, weigh their credibility, and develop a "feel of the case." Id. at 293. However, we will not hesitate to set aside a ruling that is "so wide of the mark that a mistake must have been made." N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 38 (2011) (quoting M.M., 189 N.J. at 279).

We also accord no deference to the trial court's "interpretation of the law and the legal consequences that flow from established facts." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). The Division "must prove that the child is 'abused or neglected' by a preponderance of the

11

evidence, and only through the admission of 'competent, material and relevant evidence.'" P.W.R., 205 N.J. at 32 (quoting N.J.S.A. 9:6-8.46(b)).

The trial court found the Division established abuse or neglect pursuant to N.J.S.A. 9:6-8.21(c), which declares a child to be abused or neglected if the child's:

> physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent . . . to exercise a minimum degree of care . . . (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court . . . .
>
> [N.J.S.A. 9:6-8.21(c)(4).]

The purpose of Title Nine is "to protect children 'who have had serious injury inflicted upon them' and make sure they are 'immediately safeguarded from further injury and possible death.'" N.J. Div. of Youth & Family Servs. v. A.L., 213 N.J. 1, 18 (2013) (quoting N.J.S.A. 9:6-8.8(a)). Thus, "[t]he law's 'paramount concern' is the 'safety of the children,' and 'not the culpability of parental conduct[,]'" and "[t]he focus in abuse and neglect matters . . . is on promptly protecting a child who has suffered harm or faces imminent danger."

A-1596-18T4

Ibid. (citations omitted) (quoting G.S. v. Dep't of Human Servs., 157 N.J. 161, 177 (1999)).

Courts need not wait for harm to occur, but the Division must present proof of "'imminent danger or a substantial risk of harm to a child by a preponderance of the evidence.'" N.J. Dep't of Children and Families v. E.D.-O., 223 N.J. 166, 178 (2015). In other words, "evidence of actual impairment will satisfy the statute, but in a case where there is no such proof, the critical focus is on evidence of imminent danger or substantial risk of harm." A.L., 213 N.J. at 22.

Also, "[t]o find abuse or neglect, the parent must 'fail . . . to exercise a minimum degree of care.'" E.D.-O., 223 N.J. at 179 (quoting N.J.S.A. 9:6-8.21(c)(4)(b)). This requires "'conduct that is grossly negligent because it is willful or wanton . . . but not necessarily intentional.'" Ibid. (quoting G.S. 157 N.J. at 178). "Willful or wanton" conduct is "done with the knowledge that injury is likely to, or probably will, result." Ibid. (quoting G.S., 157 N.J. at 178). It "implies that a person has acted with reckless disregard for the safety of others." Ibid. (quoting G.S., 157 N.J. at 179). "[T]herefore, the Court held that 'a guardian fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child

or recklessly creates a risk of serious injury to that child.'" Ibid. (quoting G.S., 157 N.J. at 181).

The determination "is fact-sensitive and must be resolved on a case-by-case basis." E.D.-O., 223 N.J. at 192. Courts undertaking this analysis "must avoid resort to categorical conclusions." Id. at 180 (citing Dep't of Children & Families, Div. of Youth & Family Servs. v. T.B., 207 N.J. 294, 309 (2011)). "Instead of filling in missing information . . . judges must engage in a fact-sensitive analysis turning on 'particularized evidence.'" N.J. Div. of Child Prot. & Permanency v. R.W., 438 N.J. Super. 462, 468-71 (App. Div. 2014) (quoting A.L., 213 N.J. at 28).

### III.

Defendant first argues that "[e]ven assuming the acts of domestic violence occurred as reported, the evidence . . . is insufficient to establish harm to the children and cannot support a finding of abuse and neglect," as the Division "did not prove that the children faced a substantial risk of harm from merely being present in the home when the incidents occurred." We agree with Kyle and the Law Guardian with respect to the February 28, 2016 incident but are unable, without further factual findings from the trial court, to resolve the issues related to the August 21, 2016 and January 29, 2017 incidents and accordingly vacate

14

those portions of the court's January 24, 2018 order and remand for further proceedings consistent with this opinion.

As to the first incident, the court found that Kyle "essentially[] use[d] a sleeping child as a shield" and "did not think about the impact on [Mindy], if she suddenly woke up to find armed officers in her bedroom," or "the fear . . . she might have had if they had to draw their weapons." Those findings are unsupported by the record.

Because Annie could not recall the February 28, 2016 incident, Sergeant Field's trial testimony provided the basis for the court's factual findings. He did not, however, testify directly, nor is it a reasonable inference from his testimony, that Kyle used Mindy as a shield, or that she was at risk of harm due to Kyle's presence in the room. And Sergeant Field did not state that Mindy was at risk of harm based on the police presence in her room while armed or otherwise. Although Kyle was found hiding in the closet, he was arrested and removed from Mindy's room without incident and without waking her. Consequently, the court's determination that Mindy was placed in imminent danger or exposed to a substantial risk of harm as a result of Kyle's conduct on February 28, 2016 is so "inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice," that it must be reversed. See Griepenburg

15

v. Twp. of Ocean, 220 N.J. 239, 254 (2015) (quoting Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484 (1974)); Pioneer Nat'l Title Ins. Co. v. Lucas, 155 N.J. Super. 332, 338 (App. Div.), aff'd o.b., 78 N.J. 320 (1978).

The court's factual findings related to the August 21, 2016 and January 29, 2017 incidents present a different challenge to our usually deferential standard of review. Specifically, the court's findings do not address those portions of Annie's testimony at the fact-finding proceeding that contradicted her earlier statements to the police.

With respect to the August 21, 2016 incident, the court found based on Annie's and Officer Brennan's credible testimony that Annie was restrained for "an hour or more." That conclusion was based on the statement Annie gave to police. Annie stated at trial, however, that Kyle "held [her] in the closet hostage for a couple of minutes" and admitted that she "[did not] remember how long . . . [as she] was just trying to get out of there." The court's oral opinion does not reconcile this conflicting evidence and, in fact, incorrectly characterized Annie's recorded statement and her trial testimony as "identical." This is not an insignificant discrepancy as the court relied on the length of time Annie was restrained in the closet when it determined Kyle effectively rendered Mindy unsupervised, and hence at a risk of harm, by removing Annie as a caretaker.

A-1596-18T4

Similarly, with respect to the January 29, 2017 incident, the court's claim that both children "were, essentially, left home alone for at least an hour" as a result of Kyle's conduct is also contrary to Annie's testimony at the fact finding proceeding. Although Annie told the police Kyle punched her in the face, "pulled out a knife," and "had [her] in the kitchen for . . . almost an hour," at the fact-finding proceeding she stated that during the incident she "kept going back and forth" between the kitchen and Steven's room and was already "giving [him] his medication." Annie also emphasized that after the incident began, she put Steven down, had a baby monitor, and continued to check on him. It is clear from these portions of the transcripts that contrary to the court's characterization, Mindy's version of events as recounted on her police statement and testimony was not "identical."

On remand, the court should issue additional factual findings addressing the aforementioned discrepancies and should also address whether the court's amended factual findings alter its conclusion that the Division satisfied its burden to establish that the children were placed in imminent danger or substantial risk of harm by Kyle's acts of domestic violence on August 21, 2016 and January 29, 2017. N.J. Div. of Child Prot. & Permanency v. Y.N., 222 N.J. 308, 309 (2015); A.L., 213 N.J. at 22; see also N.J.S.A. 9:6-8.46. Specifically,

the court should clarify its findings regarding the circumstances surrounding the August 21, 2016 and January 29, 2017 incidents, including, but not limited to, the clear dispute regarding the length of time during which the events transpired and the attendant risk of harm, if any, to the children. With respect to the January 29, 2017 incident, the court should also resolve whether Annie was able to attend to Steven's needs and if any delay in providing medical care or medicine led to a substantial risk of harm or imminent danger. Finally, to the extent the court accepts Annie's version of the events based on her recorded statement as opposed to her testimony at the fact-finding proceeding to support its amended findings, the court should make that finding, and the bases for it, clear. We leave the scope of the remanded proceedings to the discretion of the trial court.

IV.

Because we are remanding the matter for additional factual findings related to the August 21, 2016 and January 29, 2017 incidents, we address Kyle's argument that the court committed reversible error when it admitted into evidence photographs of Annie's injuries. We disagree with Kyle that the court abused its discretion when it admitted and considered the photographs as they were clearly relevant and not unduly prejudicial.

18

"[I]n reviewing a trial court's evidential ruling, an appellate court is limited to examining the decision for abuse of discretion." Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008). Under that standard, "[c]onsiderable latitude is afforded a trial court in determining whether to admit evidence," and "an appellate court should not substitute its own judgment for that of the trial court, unless 'the trial court's ruling was so wide of the mark that a manifest denial of justice resulted.'" New Jersey Div. of Child Prot. & Permanency v. N.T., 445 N.J. Super. 478, 492 (App. Div. 2016).

Photographic evidence is usually admissible as demonstrative proof, assuming it is relevant, N.J.R.E. 401; fairly and accurately depicts the subject matter at the time of the event in question, Spedick v. Murphy, 266 N.J. Super. 573, 590 (App. Div. 1993); is properly authenticated or verified as a true representation, Garafola v. Rosecliff Realty Co., 24 N.J. Super. 28, 42 (App. Div. 1952); and is not otherwise unduly prejudicial, confusing, misleading or wasteful of time. N.J.R.E. 403.

N.J.R.E. 401 defines "relevant evidence" as "evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." Courts consider evidence to be probative when it has a tendency "'to establish the proposition that it is offered to prove.'" Wymbs ex rel. Wymbs

v. Twp. of Wayne, 163 N.J. 523, 534 (2000) (quoting Green v. New Jersey Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)). The evidence must be probative of a fact that is "really in issue in the case," as determined by reference to the applicable substantive law. State v. Buckley, 216 N.J. 249, 261 (2013) (quoting State v. Hutchins, 241 N.J. Super. 353, 359 (App. Div. 1990)).

Under N.J.R.E. 401, "[e]vidence need not be dispositive or even strongly probative in order to clear the relevancy bar." Buckley, 216 N.J. at 261. "The proponent need not demonstrate that the evidence can, in and of itself, establish or disprove a fact of consequence in order to meet the benchmark of N.J.R.E. 401." State v. Cole, 229 N.J. 430, 448 (2017). "Once a logical relevancy can be found to bridge the evidence offered and a consequential issue in the case, the evidence is admissible, unless exclusion is warranted under a specific evidence rule." Burr, 195 N.J. at 127; see N.J.R.E. 402.

Here, the photographs clearly cross the low evidentiary bar of N.J.R.E. 401. The photographs were relevant, and not unduly prejudicial, because they informed the court of the extent of the domestic abuse and the degree to which Annie was incapacitated by Kyle in the closet and kitchen and to the degree the children may have been rendered unsupervised. Further, although the court did not expressly cite N.J.R.E. 403, we glean from the court's comments that the

photographs "somewhat relat[e] to the issue at hand" and the weight it would give was "yet to be determined" that it considered the prejudicial impact of those proofs. Finally, here there was no jury, and an experienced judge "is much less likely to be prejudiced by [its] admission than a one-case, fact-finding jury would be." In re Commitment of R.S., 339 N.J. Super. 507, 539 (App. Div. 2001).

V.

Nothing in our decision should be interpreted as excusing Kyle's conduct during any of the three incidents or minimizing its significance. In that regard, we note the availability of potential relief under the Prevention of Domestic Violence Act of 1991, N.J.S.A. 2C:25-17 to -35, or the Criminal Code for those actions. Here, however, we are charged with analyzing the issues under Title Nine, where our primary concern is the "safety of . . . children," and "not the culpability of parental conduct." A.L., 213 N.J. at 18, and where courts must "engage in a fact-sensitive analysis" based on competent evidence and cannot "fill[] in missing information." See R.W., 438 N.J. Super. at 468-71 (quoting A.L., 213 N.J. at 28).

Reversed in part, vacated and remanded in part, and affirmed in part as to the photographic evidence. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

21

A-1596-18T4