JOSEPH JAMES IMRE, PLAINTIFF-APPELLANT, v. RIEGEL
PAPER CORPORATION, DEFENDANT-RESPONDENT.

Argued May 20 and 27, 1957—Decided June 10, 1957.

*Mr. Frank G. Schlosser* argued the cause for the appellant (*Messrs. Mackerly and Friedman,* attorneys).

*Mr. Robert Shaw* argued the cause for the respondent (*Messrs. Shaw, Pindar, McElroy & Connell,* attorneys).

The opinion of the court was delivered by

HEHER, J. The action is in tort for negligence in the use of the defendant's lands. A jury was empanelled to try the issue in the Law Division of the Superior Court; and at the close of the testimony taken on behalf of both parties, there was judgment final for defendant by direction of the judge. The evidence was deemed insufficient to sustain the pleaded common-law liability. The Appellate Division affirmed, 43 *N. J. Super.* 289 (1957); and the case is here by our certification at the instance of the plaintiff.

The mishap occurred May 28, 1951. The prior January plaintiff, then 33 years of age, entered into the employ of defendant at its plant in Milford, New Jersey, in the chemical mix department; the employer maintained a tract of land adjacent to the Delaware River, one-quarter of a mile to the south of its factory, for the "surface incineration" of the waste products of manufacture; it was an open area contiguous to the river bank, extending east to the parallel Frenchtown Road; there was a wire fence along the westerly side of the road and a gateway for the passage of defendant's trucks used to convey the debris and waste matter along a "winding" roadway to the "dumping" section at or near the river bank, there to be burned; the "dump" had "reached a length and breadth of some 300 feet" and had a surface elevation of "10 to 15 feet above the level of the river at its adjacent bank"; the "sections which were thought to be burned out were covered by 'fly ash,' coal ash, from the mill's boilers," a finding by the Appellate Division supported by the proofs; 12 noon to 1 P. M. was plaintiff's lunch hour and, as had been his wont when the weather was favorable, he went off to the grounds in question at the noon recess of the given day, intending to partake of his lunch and to fish from the adjoining river bank; he entered the open gateway, parked his automobile near the "dumping" area, there had his lunch in part and then proceeded on foot with rod and reel across the dump "which from his observations had apparently burned out and its ash surface solidified," but when he "arrived close to the river's edge," the "surface of the dump caved in beneath him, submerging his body up to the waist in a pit of unextinguished hot embers," and he thereby suffered grievous bodily injuries entailing medical expenses and wage losses amounting to $12,000, all matters of fact found by the Appellate Division in accordance with the evidence; it was there also found that the " 'dump' became progressively enlarged by the daily deposits of debris at the northerly, easterly, and southerly sides of the area," and that it "may be inferred that the spaces of the dump in which the burning had sufficiently declined were customarily

supplied with a cover or crust of coal ash from the boilers of the factory to await the natural and ultimate extinguishment of the underlying fires."

But the trial judge was of the view that plaintiff was a trespasser and there was no violation of the duty owing by a possessor of land to one who trespasses on the land: and the rationale of the Appellate Division's judgment is that the "use of fire, unless reasonably attended and regulated, is dangerous"; the adjective " 'dangerous' has a close acquaintance with 'foreseeability of harm,' which latter element constitutes the basis of legal liability and denotes the dimensions of the duty of proportionate care"; the inquiry, it is there suggested, is whether there is "any evidence in the case of facts which by the actual information thereof, or by knowledge thereof which it ought to have acquired from its reasonable supervision of the premises, should have caused the defendant to foresee the likelihood of such an injurious mishap," i. e., the likelihood that "either the plaintiff or an adult intruder such as the plaintiff would endeavor to walk across the top of the dump," and there is "no evidence whatever that any one other than the plaintiff and one other ever followed that adventurous course over the obvious dump to the river bank"; and the holding was that while there was evidence that "over the adjacent range of farm land persons, probably trespassers, were occasionally observed to be hunting game," these trespasses did not extend to "the top of the dump," and there was "no evidential support for the impression that persons other than the plaintiff sought habitually and noticeably to fish from the shore of the river at a location beneath the embankment of the dump"; that "proof of the mere burning of refuse at such an isolated and secluded location does not carry within itself an inference of expectation of serious bodily harm," and "in the light of the evidence of past events, the plaintiff committed a reasonably unexpected act—a venturesome attempt to walk across the dump as a 'short cut' to the river"; the evidence, in fine, "lacked that requisite adequacy, particularly in the essential element of foresight for serious bodily harm."

We have set forth thus at length the reasoning of the Appellate Division in order to show that we are not altogether in disagreement as to the essential principle but largely in the application of the principle to the facts and circumstances of this case.

## I.

Defendant invokes the "general rule," *Restatement, Torts, section* 333, that "a possessor of land is not subject to liability for bodily harm caused to trespassers by his failure to exercise reasonable care," and that "the only duty owed by the owner or possessor of land with respect to trespassers is to refrain from acts wilfully injurious * * *," citing *Tahan v. Wagaraw Holding Co.,* 28 *N. J. Super.* 436 (*App. Div.* 1953); *Lordi v. Spiotta,* 133 *N. J. L.* 581 (*Sup. Ct.* 1946).

 The possessor of land is liable for the reasonably foreseeable injurious consequences of the use of a dangerous agency on the land. However it may be phrased, this doctrine of liability for hurt to others is basic to the common law. Where an act carelessly done would be highly dangerous to the personal safety of others, the common law raises a "public duty" of care commensurate with the risk of harm. *Strang v. South Jersey Broadcasting Co.,* 9 *N. J.* 38 (1952). Fire has ever been deemed "a dangerous as well as a beneficent agency, to be handled with care"; and liability does not necessarily depend on invitation but may be grounded in "responsibility for a dangerous agency," citing *Van Winkle v. American Steam Boiler Co.,* 52 *N. J. L.* 240 (*Sup. Ct.* 1890), Beasley, C. J.; the one "who sets a fire and is negligent in setting or guarding it is liable if damage results"; the test is whether "injury to the plaintiff or to a class of which the plaintiff was one ought reasonably to have been anticipated," citing *Piraccini v. Director General of Railroads,* 95 *N. J. L.* 114 (*E. & A.* 1920), Swayze, J. As pointed out in *Strang,* reference was made in this latter case to the stringency of the early English law that he in whose house

or chambers a fire originated, whether by negligence or mere accident, was responsible for injuries occasioned by its spread to other premises, extended by the King's Bench in 1697 to fires kindled in an owner's close.

The rule at the English common law is that the proprietor of an instrument which, unless properly handled, is "a dangerous thing," is deemed "an indemnifier for all losses, sufficiently proximate, occasioned by its use"; where a person brings upon his land "some dangerous thing, such as fire or water, or a dangerous animal," he "is bound * * * to keep it at home at his peril"; "In all these classes of cases, something more than 'care,' however diligent, is demanded, *viz.*, absolute indemnity." But the American decisions are generally less stringent; "Where the dangerous thing is not in its nature and under the circumstances a nuisance *per se,* the maintainer of it is not, in any sense, an insurer against the loss that it may accidentally cause; he is responsible only for negligence or want of skill in his management or use"; "Nevertheless, as the thing employed is threatful of peril to others, and as he is using such thing for his private benefit, it has been properly established that the proprietor must exercise a high degree of care, and that if he omits to do so he will be answerable for the ill consequences to others that are the natural and proximate result of such default"; the obligation comprehended in the maxim *sic utere ut alienum non laedas* is that by having "this boiler in use, conditioned as described, the paper company could not by any device free itself from the duty of operating it with the utmost care and skill, nor from the liability to indemnify those who should be injured, in a legal sense, by the omission of such care and skill." *Van Winkle v. American Steam Boiler Co.,* cited *supra.*

The standard of duty is the protection of others against an unreasonable risk of harm; and the principle is operative in favor of trespassers on land if the presence of the particular trespasser be discovered, or the possessor of the land be aware of constant trespassing upon a particular place or

a limited area and the act is likely to cause death or serious bodily harm. *Strang v. South Jersey Broadcasting Co., supra.*

The general rule of liability to trespassers for acts willfully injurious given in the *Restatement, section* 333, is qualified by the exceptions formulated in *sections* 334 to 339. *Section* 335 declares it to be a principle of actionable negligence that a possessor of land who knows, or from facts within his knowledge should know, that trespassers constantly intrude upon a limited area thereof, is liable for their bodily harm ensuing from an artificial condition on the land created or maintained by the possessor, and the condition is, to his knowledge, likely to cause death or serious bodily harm to such trespassers and is of such a nature that he has reason to believe that such trespassers will not discover it, and the possessor has failed to exercise reasonable care to warn such trespassers of the condition and the risk involved. The rule applies not only to adult trespassers but also to children. *Section* 339 embodies the rule subjecting a possessor of land to "peculiar" liability to trespassing children.

Thus, the elements of liability under the given concept relate to a condition such in nature that the possessor knows it is likely to cause death or serious bodily harm to such trespassers and has reason to believe the trespassers will not discover it, and there is a failure of reasonable care to warn the trespassers of the condition and the attendant risk of injury.

As in the case of a gratuitous licensee, the trespasser's awareness of the peril is an absolute bar to recovery: for the occupier's liability arises out of the want of due care to warn the trespasser of the concealed danger. See *Taneian v. Meghrigian,* 15 *N. J.* 267, 275 (1954). The duty is in principle as compelling in the one case as in the other: the natural duty of reasonable care to warn of the hidden risk of death or severe bodily injury to either the bare licensee or the trespasser where the recurring intrusions are known or "from the facts within his knowledge" should have been known to the possessor of the land.

The owner of land who, knowing that persons are in the habit of crossing it, and acquiescing in the practice, puts a "dangerous beast," *i. e.,* a horse known to be dangerous, on his ground without warning of the danger is guilty of negligence and liable in damages to a person traversing the field who is injured by the animal. There, the plaintiff "was not in this field of right at all," but "as one of the public who habitually used the field to the knowledge of the defendant"; and Lord Loreburn said that "in those circumstances it cannot be right that the defendant should with impunity allow a horse which he knows to be a savage and dangerous beast to be loose in that field without giving any warning whatever, either to the plaintiff or to the public, of the dangerous character of the animal." *Lowery v. Waller,* [1910] *A. C.* 10, 80 *L. J. K. B.* 138. See also *Glidden v. Moore,* 14 *Neb.* 84, 15 *N. W.* 326 (*Sup. Ct.* 1883).

There may be such acquiescence as to amount to an implied leave and license. *Adams v. Naylor,* [1944] *K. B.* 750. "Permission must be proved, not tolerance, though tolerance in some circumstances may be so pronounced as to lead to a conclusion that it was really tantamount to permission," *e. g.,* "a mere putting up of a notice 'No Trespassers Allowed' or 'Strictly Private,' followed, when people often come, by no further steps, would, I think, leave it open for a Judge or jury to hold implied permission." *Addie & Sons v. Dumbreck,* [1929] *A. C.* 358, Lord Dunedin.

And the tendency in this country is to hold that the defendant's continued toleration of the trespass amounts to permission to make use of the land, and thus the plaintiff is a licensee and not a trespasser; but the real basis of liability to such "tolerated intruders," says Dean Prosser, "would seem to be only the ordinary duty to protect another, where the harm to be anticipated from a risk for which the defendant is responsible outweighs the inconvenience of guarding against it." *Prosser, Law of Torts* (2d ed. 1955), *section* 76. See also *Green, "Landowner v. Intruder; Intruder v. Landowner,"* 1923, 21 *Mich. L. Rev.* 495, 57 *Am. L. Rev.* 321.

Here, defendant was aware of the danger; it had in its employ a "safety director" whose duty, the director himself said, was "to look out for the welfare and safety of the employees." The witness described the "dump area" as a "flat plateau," a "semi-circle"; and, in response to a question as to whether "after the fires are out, they dump ash on top, to fill it over, to level off the dump with ashes on top," he replied: "Oh, yes, except, I would like to make a correction on that; it is not ashes it is a substance known as fly ash; it is not hot ash." Asked if, "as safety director," he would "go down to the dump as much as once a month," he said, "Possibly, that is a good estimate."

Plaintiff, according to his own testimony, proceeded on foot toward the river along a "two-foot wide path leading over to the embankment," extending over a "ledge, down to the Delaware River," until he reached a point on the path just short of the embankment, "at the edge of the embankment," when the seemingly firm ground gave way and he was precipitated into the "hot coals" beneath the surface, of which there was no prior evidence or warning in the form of fire or smoke or otherwise, and so he was led into a trap of which he was unaware. The "surface of the path," he testified, "was beaten down into the top, there was grass growing, and to my left and right there was debris which was dumped there, but previously"; "it had been dumped there for some time"; "There was some [grass] above and on the side [of the path]"; and there were "some trees to the left and down below [the ledge]"; the ledge was 30 or 40 feet from the river; plaintiff had used the "path often"; it "was a beaten path leading down towards the river, the Delaware River shore"; he had "walked up [on the embankment] over the path"; it "was not a dump on top; they didn't deposit debris there"; the embankment "was built of dump material, at the edge of the path"; he had "walked on it on many occasions"; he had gone to the particular area on an average of three times a week beginning early in February; and he had seen adults and children make use of the path and the premises on his visits there.

On the day of the mishap, he saw surface fires, but none "in that area, as far as 500 feet which the path was centered in between," yet he spoke of fires 200 or 300 feet away to the right and the left as he walked along the path.

The "beaten path" bespeaks constant use, such as implies knowledge and acquiescence by the possessor of the land, or so the jury could well have found; and there was direct evidence of the use of the foot path and the premises by outsiders; the lands were used by hunters; the witness Penyak testified that "so many people used the area," he "couldn't start naming all the names"; the witness Caccesi gave corroborating evidence of the use of the lands by outsiders; and there were no posted signs warning against trespassing or the attendant danger. The gateway was always open by day.

The Appellate Division dismissed the evidence of a "well beaten" path as irrelevant to the issue of acquiescence in the use made of it by plaintiff and "knowledge and thus foresight of the likelihood of serious bodily harm to one who might enter the limited dangerous area," because "it must be realized that while the path was visible, even more so was the dumping ground, an area which was not shown to have been a place upon which persons, if any, *constantly and persistently* trespassed or would be expected to do so."

But the footpath was itself evidence of repeated use such as was made of it by plaintiff, as a means of access to the river bank, by strangers as well as persons under the permission of the landowner; on the showing made, the jury could well have found that defendant's use of the land was largely for the trucking of waste material to the "dumping" area; and where, as here, one undertakes upon his land an operation fraught with danger of serious bodily harm to persons unaware of the hazard, and there is a reasonable probability that trespassers may come upon the land, then the duty to give warning of the concealed peril to their safety would seem to be fairly grounded in a compelling sense of social morality and justice, just as in the case of a "discovered" trespasser. In the choice of competing

considerations of societal policy, the need for protection against the reasonably foreseeable risk of death or severe personal injury outweighs the freedom of action that would otherwise characterize the relation of the possessor of land to a trespasser. Death or serious injury is too great a price to pay for a mere trespass, so circumstanced. The case is well within the doctrine expounded in the *Restatement* cited *supra;* and there were issues of fact for the jury in accordance with the foregoing principles.

## II.

This action was preceded by a proceeding for workmen's compensation under *R. S.* 34:15–1, *et seq.* After answer and hearing, the Division of Workmen's Compensation found that the accident which thus befell plaintiff "did not arise out of and in the course of his employment with the respondent"; that the accident "did not arise in the course of his said employment, because it occurred at a place where he had no right to be and where he had no service to perform pursuant to his contract of hire," and it "did not arise out of the employment because it was not the result of a risk even remotely connected with his particular job as a chemical mixer—the operation of such worker being performed entirely in the basement of the respondent's main plant"; and the petition was accordingly dismissed.

It is now contended, as it was below, that plaintiff "was estopped from establishing in this action any claim of constant intrusion" on defendant's lands "because of the adverse determination of the same claim in the Workmen's Compensation proceeding."

The specific point made is that "a material and essential element of the right to recover at common law had been decided adversely" to plaintiff in the Compensation Bureau, and he is now precluded from "relitigation of this issue in this common-law action," and a "custom of user of defendant's land with the knowledge of defendant had been asserted and plaintiff had failed in his proofs before the Bureau to estab-

lish such user"; that the judgment thus given in the Bureau is *res judicata* of "all matters competent to be heard and actually heard" in that proceeding, including plaintiff's "relationship to defendant, his status on the land, and the lack of a custom to use the land for fishing, recreation or lunching," and plaintiff is precluded from showing "a custom of constant intrusion onto defendant's land, for such proof could be nothing more than a rehash of the compensation case."

But the statutory proceeding for workmen's compensation and the common-law liability for negligence invoked here are mutually exclusive remedies; the former affords what is essentially social insurance in the common and individual interest, irrespective of fault, agreed exclusive relief for the consequences of an industrial accident arising out of and in the course of the employment; the latter is the common-law mode of redressing personal injuries attributable to fault not within the Compensation Act. *Smith v. International High Speed Steel Co.,* 98 *N. J. L.* 574 (*E. & A.* 1923); *Downing v. Oxweld Acetylene Co.,* 112 *N. J. L.* 25 (*Sup. Ct.* 1933).

Thus, the doctrine of *res judicata* has no application; and there is no collateral estoppel by judgment or verdict. The requisite identity of subject matter and cause of action is lacking; and the relief here sought does not rest upon the "same point or question which, in essence and substance, was litigated and determined" in the compensation proceeding. *Hudson Transit Corporation v. Antonucci,* 137 *N. J. L.* 704 (*E. & A.* 1948).

The judgment is accordingly reversed; and the cause is remanded for further proceedings in conformity with this opinion.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, WACHENFELD, BURLING, JACOBS and WEINTRAUB—6.

*For affirmance*—Justice OLIPHANT—1.