677 A.2d 705

PATRICK BRETT AND ELISA RAMUNDO, PLAINTIFFS–RESPON-
DENTS, v. GREAT AMERICAN RECREATION, INC., DEFEN-
DANT–APPELLANT, AND STONEHILL PROPERTY OWNERS
ASSOCIATION, INC., AND HOTEL SECTION CONDOMINIUM
COUNCIL, INC., DEFENDANTS AND THIRD–PARTY PLAIN-
TIFFS, AND RUDOLPH MAURIZZI, DEFENDANT AND
THIRD–PARTY PLAINTIFF–RESPONDENT, v. DENISE
McDADE AND NANCY MORGAN, THIRD–PARTY DEFEN-
DANTS.

KAREN FURMAN, PLAINTIFF–RESPONDENT, v. GREAT AMERI-
CAN RECREATION, INC., DEFENDANT–APPELLANT, AND
STONEHILL PROPERTY OWNERS ASSOCIATION, INC., AND
HOTEL SECTION CONDOMINIUM COUNCIL, INC., DEFEN-
DANTS AND THIRD–PARTY PLAINTIFFS; v. RUDOLPH MAU-
RIZZI, THIRD–PARTY DEFENDANT–RESPONDENT.

DONALD PISARCIK, PLAINTIFF–RESPONDENT, v. GREAT
AMERICAN RECREATION, INC., DEFENDANT–APPELLANT,
AND STONEHILL PROPERTY OWNERS ASSOCIATION, INC.,
AND HOTEL SECTION CONDOMINIUM COUNCIL, INC., DE-
FENDANTS, AND RUDOLPH MAURIZZI, DEFENDANT–RE-
SPONDENT.

MEGAN RUSSELL, PLAINTIFF–RESPONDENT, v. GREAT AMERI-
CAN RECREATION, INC., DEFENDANT–APPELLANT, AND
STONEHILL PROPERTY OWNERS ASSOCIATION, INC., AND
HOTEL SECTION CONDOMINIUM COUNCIL, INC., DEFEN-
DANTS AND THIRD–PARTY PLAINTIFFS, AND RUDOLPH
MAURIZZI, THIRD–PARTY DEFENDANT–RESPONDENT,
AND LISA CARMELITANO AND KAREN FURMAN, THIRD–
PARTY DEFENDANTS.

Argued November 28, 1995—Decided June 13, 1996.

484

*George C. Jones* argued the cause for appellant (*Ribis, Graham & Curtin* and *Samuel A. DeGonge,* attorneys; *Mr. DeGonge* and *Jerome J. Graham, Jr.,* of counsel).

*Philip G. Auerbach* argued the cause for respondents Patrick Brett, Elisa Ramundo, Karen Furman and Donald Pisarcik.

*John P. Doran* argued the cause for respondent Megan Russell.

*Jared E. Stolz* argued the cause for respondent Rudolph S. Maurizzi (*Methfessel & Werbel,* attorneys).

The opinion of the Court was delivered by

STEIN, J.

This appeal requires us to consider the scope and proper application of the New Jersey Ski Statute, *N.J.S.A.* 5:13–1 to –11 (Ski Statute). Plaintiffs sued for compensation for injuries they sustained in an accident while tobogganing on a snow-covered hill that was part of a ski resort operated by defendant. The trial court instructed the jury to apply the Ski Statute, and the jury returned a verdict for plaintiffs. The Appellate Division affirmed, 279 *N.J.Super.* 306, 652 *A.*2d 774 (1995), concluding that the Ski Statute governed and that it was correctly interpreted by the trial court. We granted certification. 141 *N.J.* 97, 660 *A.*2d 1196 (1995).

I

Plaintiffs, Patrick Brett, Karen Furman, Donald Pisarcik, Megan Russell, and Elisa Ramundo, were five of a larger group of college friends, then twenty and twenty-one years old, who had travelled to Vernon Township to spend a winter weekend at a condominium there. The condominium belonged to defendant Rudolph Maurizzi, an uncle of one of the group. It is one of a number of condominiums built along the slope of Great Gorge North on either side of a vacant strip of hillside about a thousand feet long. During the winter, the vacant strip is a ski trail known as the Bunny Buster. The trail is part of the ski resort operated by defendant Great American Recreation, Inc. (Great American). Great American operates the trail pursuant to an easement from defendants Stonehill Property Owners Association, Inc. and Hotel Section Condominium Council, Inc. (Stonehill), who own the land.

Members of the group arrived on Friday at different times. Furman, and third-party defendants Denise McDade and Lisa Carmelitano (Maurizzi's niece) arrived early, and spent part of the day skiing at the resort. As the afternoon advanced, the trails were illuminated by artificial lights. When the resort closed for the night, those lights were turned off. The skiers returned to the condominium over the ski trails, crossing the Bunny Buster trail in the dark.

Earlier that day, another member of the group had discovered a plastic toboggan that Maurizzi stored in his condominium with other snow equipment. By evening, all the members of the party had arrived. Between ten and eleven o'clock that night, someone noticed that the lights on the Bunny Buster trail had been turned back on. Great American had illuminated the trail to enable its employees to groom it for the next day's skiers. Observing the lighted slope, the group decided to use Maurizzi's toboggan on the trail. There was testimony at trial that other people were also present and using the trail for sledding or tobogganing. Maurizzi's toboggan could hold no more than six people, so members of the group took turns riding it. The first two runs were uneventful.

The third run, with six on board, was a disaster. Starting from a point a bit higher than where the first two runs had begun, the toboggan slid down the trail, across a fifty to sixty-foot flat expanse of snow at the base of the trail, over a flattened snow fence, and then over the edge of a twenty-foot dirt embankment to a parking lot below. One of the six fell off the toboggan before it dropped over the edge, thereby escaping injury. The other five, plaintiffs, were propelled off the embankment, into the parking lot, and into a utility pole located there.

All were evacuated by ambulance to a hospital with grave injuries. According to plaintiffs' testimony, Furman suffered a head injury that required brain surgery, and led to partial paralysis, cognitive disabilities, and impaired speech. She also broke her leg and eight ribs, and one of her lungs was punctured. Russell

required extensive, reconstructive facial surgery; she also suffered back injuries, and has lost the use of her right eye. Ramundo's back was broken and she was in a body cast for six months. Pisarcik sustained fractures of the skull, facial bones, and clavicle, and both lungs were collapsed. Brett's jaw was broken and he required back surgery. The record indicates that Russell and Furman bear some facial disfigurement. None of the plaintiffs have been able fully to return to the physical activities they enjoyed before the accident.

There was evidence that, at the time of plaintiffs' rescue by emergency medical personnel, other tobogganers not associated with plaintiffs' group escaped injury by tumbling off their toboggan just before it dropped over the edge of the embankment. A security guard employed by Stonehill testified that in the past he had seen children sleighriding on the hill. In addition, he had ordered sleighriders off the Bunny Buster hill on three or four occasions when the ski area was closed. Removing sleighriders or tobogganers from the hill was not, however, a high priority for the Stonehill security team. The security guard testified that he had other duties on the night of the accident.

Plaintiffs filed suit against Great American and Stonehill. Maurizzi and Carmelitano were named as third-party defendants and then joined as defendants by plaintiffs. McDade and another member of the party, Nancy Morgan, were also named as third-party defendants. Stonehill settled with plaintiffs before trial. The individual defendants and third-party defendants, including Maurizzi, were dismissed from the case on their motions for summary judgment. Those dismissals were affirmed by the Appellate Division and are not challenged before us.

The proper interpretation of the Ski Statute is critical to our disposition of this appeal. In general, the Ski Statute sets forth certain duties for ski-resort "operators" and for "skiers" as those terms are defined in the statute. Operators must post signs or otherwise distribute information on the difficulty and condition of the ski trails and "[r]emove as soon as practicable obvious, man-

made hazards." *N.J.S.A.* 5:13–3(a)(1) to –3(a)(3). Skiers, defined in some circumstances to include tobogganers, must know the limits of their abilities, ski under control, and ski only on designated trails. *N.J.S.A.* 5:13–4(c) to –4(g). The statute also provides that skiers assume risks inherent in their sport. *N.J.S.A.* 5:13–5.

Great American moved for involuntary dismissal at the close of plaintiffs' case, *see R.* 4:37–2, and for judgment at the close of all the evidence. *See R.* 4:40–1. In support of its motion for dismissal, Great American argued that the Ski Statute applied to plaintiffs' claims. Defendant maintained that plaintiffs were skiers as defined by the statute and, accordingly, had an obligation to know the limits of their abilities and to maintain control of their course and speed, and that they assumed the risk of the hazard they encountered. In addition to being skiers, defendant contended that plaintiffs were also trespassers and that its common-law duty to plaintiffs was merely to refrain from willfully injurious acts. As a result, Great American argued, it owed plaintiffs none of the statutory duties of operators, and plaintiffs were "totally barred" from bringing suit. In effect, Great American's position called for an integration of the common law of premises liability with the duties codified by the Ski Statute, with the result that plaintiffs bore all of the statutory obligations of skiers, but could not benefit from any of the statutory obligations of operators because of their status as trespassers.

Plaintiffs did not contest that the statute applied, and the trial court held that it governed the case. However, the court did not accept defendant's argument that the operator owed plaintiffs none of the statutory duties, finding that if the Legislature had intended to exclude trespassers from the reach of the Ski Statute it would have done so expressly. The court held further that the record was sufficient to create a jury question whether plaintiffs were invitees, given the lighting on the slope and the possibility that defendant might be charged with knowledge that people would use the slope to toboggan. Even if plaintiffs were not invitees, however, the court held that the jury could find that

plaintiffs were persons to whom defendant owed a duty under the statute. Turning to the scope of the operator's duty, the trial court found that the statutory obligation to remove obvious, man-made hazards should be understood in its general sense as including a duty to eliminate or lessen a danger rather than including only a duty to physically remove the hazardous object. The trial court held that a reasonable jury could find that the configuration of the Bunny Buster, with the slope on one side of the snow fence, and the embankment, parking lot, and telephone pole on the other, constituted an obvious, man-made hazard.

Accordingly, the motion to dismiss was denied. Another, substantially similar motion was denied at the close of trial. In formulating the jury instruction, the trial court noted that there was agreement that for the purposes of the Ski Statute plaintiffs were to be regarded as skiers and that defendant was an operator. The court granted defendant's requests to charge the statutory duties, including assumption of risk, and agreed that the jury could consider the expert testimony to determine whether a hazard existed. The trial court also agreed with defendant that the Ski Statute displaced the common-law standard of care, and that a finding that either party had breached its statutory duties was the equivalent of a finding of negligence. The only major issue on which defendant did not prevail was its request to charge the jury that if it determined that plaintiffs were trespassers, defendant's duty under the Ski Statute would be reduced.

Accordingly, the court charged the jury:

[T]he first question you will have to consider and answer is whether the place where ... plaintiffs were injured was an obvious man[-]made hazard.

... [Y]ou can find if you feel that this is correct, that those areas included an embankment, a level area which was a driveway or a road or a parking area, and a ... utility pole at the foot of the embankment.

The trial court charged that the meaning of the expression "obvious, man-made hazard" should be determined by ordinary usage, adding only that "among the definitions of obvious in ordinary usage is something that ... is easily discovered, easily seen, easily understood, is something that is plain, patent, appar-

ent, evident, clear, or manifest, or something that is readily perceived by the eye or the intellect," and that the jury should consider the expert testimony in determining whether such a hazard existed. Turning to the operator's duty to remove such hazards, the court instructed:

> You should consider the use of the word "remove" in its ordinary and customary meaning. Now without intending to limit you ... I can indicate to you that it would be proper for you to consider that remove means not only to physically uproot, take to a different position, it also can mean to eliminate or reduce or obviate.

The jury was also instructed that plaintiffs were skiers under the Ski Statute and that they could be found negligent in contributing to their injuries if they breached one of their statutory duties to toboggan in control and within their abilities.

The jury found plaintiffs as a group, Great American, and Stonehill to be negligent. The jury apportioned the negligence as follows: plaintiffs 22%, Great American 54%, and Stonehill 24%. The jury awarded damages to all plaintiffs in the amount of $2,475,000.

Before the Appellate Division, Great American renewed its argument that the Ski Statute should be integrated with the common law to limit its duty to plaintiffs to a standard even less burdensome than that which the common law would impose with regard to trespassers. In the alternative, and apparently for the first time, defendant claimed that the Ski Statute should not have been applied at all to these facts, because the ski area was closed when the accident occurred, and because the statutory definitions of "operator" and "skier" apply only if the skier pays to ski. Under either theory, Great American claimed that it was entitled to a jury instruction charging it with no greater duty than that imposed by the common law with respect to trespassers, and that failure to so charge was reversible error.

The Appellate Division rejected defendant's arguments. 279 *N.J.Super.* 306, 652 *A.*2d 774 (1995). It agreed with the trial court that the Ski Statute applied and approved that court's interpretation of the various duties the statute imposed. The panel affirmed

the trial court's implicit holding that the design of the slope could have constituted an "obvious, man-made hazard," and noted that a simple warning of the dangers of tobogganing could have constituted "removal" of the hazard. *Id.* at 317, 652 *A*.2d 774. The court rejected Great American's argument that, as trespassers, the plaintiffs would have been barred from recovery under the common law. The court held that if plaintiffs' presence was foreseeable and the risk of injury was great, defendant owed them a non-delegable duty of care. *Id.* at 317–18, 652 *A*.2d 774.

Before this Court, defendant asserts that the Appellate Division's interpretation of an operator's duties under the Ski Statute was overbroad and in conflict with the legislative intent and the public policy underlying the law. Defendant argues that the Legislature intended to circumscribe the duties of ski-resort operators in order to prevent "runaway liability" resulting from the application of comparative negligence principles to the sport of skiing. Great American also asserts that the policy of this State is to limit litigation arising from recreational activities. Based on those principles, defendant contends that the duty to "remove" obvious man-made hazards should be construed narrowly, and not, as did both courts below, to include a duty to reduce or obviate a hazard by, for example, providing warnings. Nor, it is argued, do "hazards" properly include permanent features such as utility poles or the design of the slope. Great American also renews its argument that the Ski Statute should not have been applied to this case, because it was not an operator for sports such as tobogganing that are foreign to its business purpose and for which it receives no consideration.

## II

### A

In 1979, the Legislature enacted the Ski Statute, *L.* 1979, *c.* 29 (codified at *N.J.S.A.* 5:13-1 to -11), in response to the Vermont Supreme Court's decision in *Sunday v. Stratton Corp.,* 136 *Vt.* 293,

390 *A.*2d 398 (1978). *Assembly Judiciary, Law, Public Safety and Defense Committee, Statement to Assembly, No. 1650* (Nov. 20, 1978) (hereinafter *Committee Statement* ). In *Sunday,* the court held that the common-law doctrine of assumption of risk would no longer serve as a complete bar to skiers who seek to recover from ski-resort operators for injuries caused by hazardous trail conditions. 390 *A.*2d at 402. Before the *Sunday* decision, the law was exemplified by *Wright v. Mt. Mansfield Lift, Inc.,* 96 *F.Supp.* 786 (D.Vt.1951), which held that "[o]ne who takes part in such a sport accepts the dangers that inhere in it so far as they are obvious and necessary." *Id.* at 791.

The *Sunday* ruling uniformly was interpreted as broadening the potential liability of ski resorts. The ski industry alerted state legislators to the implications of that holding on ski-area opera- tors' liability insurance premiums and on the economics of their industry as a whole. *See* Kent Feuerhelm *et al.,* "From Wright to Sunday and Beyond: Is the Law Keeping Up with the Skiers?," 1985 *Utah L.Rev.* 885, 891 & n. 31. New Jersey was not alone in legislating in the wake of the *Sunday* decision. Some states restored the assumption-of-risk bar by creating an exception to their comparative negligence statutes. 42 *Pa. Cons.Stat.Ann.* § 7102(c); *Vt. Stat. Ann.* tit. 12, § 1037; *see* 1977 *Vt. Laws* 119 (statement of legislative intent); *Wyo. Stat.* §§ 1–1–121 to –123. Other state legislatures, including our own, did not adopt so absolute an approach, choosing instead to codify the respective duties and liabilities of skiers and resort operators and to attempt to identify the inherent risks of skiing by listing examples of risks that the skier assumes or that the resort operator has no duty to correct. *See, e.g., Alaska Stat.* §§ 05.45.010 to .210; *Colo.Rev. Stat.* §§ 33–44–101 to –114; *Conn. Gen.Stat.* §§ 29–211 to –214; *Idaho Code* §§ 6–1101 to –1109; *Me.Rev.Stat.Ann.* tit. 26, § 488; *Mass. Gen. L.* ch. 143, §§ 71I, 71N to 710; *Mich. Comp. Laws Ann.* §§ 408.321 to 408.344; *Mont.Code. Ann.* §§ 23–2–731 to –736; *Nev.Rev.Stat.* §§ 455A.010 to .190; *N.H.Rev.Stat.Ann.* §§ 225–A:1 to -A:26; *N.J.S.A.* 5:13–1 to –11; *N.M. Stat. Ann.* §§ 24–15–1 to –14; *N.Y. Lab. Law* §§ 866 to 867; *N.C. Gen.Stat.*

§§ 99C–1 to –5; *N.D. Cent. Code* §§ 53–09–01 to –11; *Ohio Rev. Code Ann.* §§ 4169.01 to .99; *Or.Rev.Stat.* §§ 30.970 to .990; *R.I. Gen. Laws* §§ 41–8–1 to –4; *Tenn. Code Ann.* §§ 68–114–101 to – 107; *Utah Code Ann.* §§ 78–27–51 to –54; *Wash. Rev.Code* §§ 70.117.010 to .040; *W. Va. Code* §§ 20–3A–1 to –8. Many state statutes impose specific duties on the operator, typically including a duty to post signs or remove non-inherent hazards. Thus, the majority of states provide a basic code of conduct for skiers and operators, often combined with a legislatively prescribed enumeration of risks assumed by skiers.

■ Our Legislature stated that its purpose was

to make explicit a policy of this State which clearly defines the responsibility of ski area operators and skiers, recognizing that the sport of skiing and other ski area activities involve risks which must be borne by those who engage in such activities and which are essentially impractical or impossible for the ski area operator to eliminate. It is, therefore, the purpose of this act to state those risks which the skier voluntarily assumes for which there can be no recovery.

[*N.J.S.A.* 5:13–1(b).]

Both the duties imposed and the underlying public policy make clear that the Ski Statute's codification of rights and remedies applies only between parties defined as skiers or ski-area operators. *N.J.S.A.* 5:13–2(c) provides that a skier is "a person utilizing the ski area for recreational purposes such as skiing or operating toboggans, sleds or similar vehicles, and including anyone accompanying the person. Skier also includes any person in such ski area who is an invitee, whether or not said person pays consideration."

In contrast, the majority of states limit their statutes to those who practice the sport of skiing. A few, however, have broader application. *See Alaska Stat.* § 05.45.200(8) (including tobogganers and anyone "using any of the facilities of a ski area, including ski slopes and trails"); *Colo.Rev.Stat.* § 33–44–103(8) (including anyone using ski area for purpose of sliding downhill on snow or ice on, among other things, a toboggan "or any other device" or using any facility of ski area including ski slopes and trails); *Me.Rev.Stat.Ann.* tit. 26, § 488(1)(B) (similar); *Mont. Code. Ann.*

§ 23–2–732(2) (including "any person admitted to a ski area or using the ski trails, areas, and other improvements"); *N.H.Rev. Stat.Ann.* § 225–A:2(II) (including any person "utilizing the ski slopes, trails, jumps or other areas" within ski area).

■ Comparison with other statutes suggests that our Legislature intended to reach a broader class of persons than those states that regulate only persons who ski, but less encompassing than those that bring virtually anyone who ventures within the ski area under their assumption-of-inherent-risk regime. Our statute provides:

> "Operator" means a person or entity who owns, manages, controls or directs the operation of an area where individuals come to ski, whether alpine, touring or otherwise, or operate skimobiles, toboggans, sleds or similar vehicles *and pay money or tender other valuable consideration for the privilege of participating in said activities* ....
>
> [*N.J.S.A.* 5:13–2(a) (emphasis added).]

Other ski statutes generally do not define a ski-area operator on the basis of whether persons pay consideration to use the ski area. Our Legislature apparently intended to limit the class of operators, and thus the reach of the law, to persons in the business of providing a place to engage in one of the prescribed types of winter sports, and defined their duties and responsibilities only in relation to persons who engage in those sports and pay for the privilege of doing so. Indeed, the statutory duties of ski-area operators apparently would be irrelevant to persons who use portions of the ski area for activities such as hiking or rock climbing. Nor may such persons be said to assume risks, inherent or otherwise, greater than those assumed by any other member of the public. The clear implication is that an entity is an operator with respect to persons who practice a particular winter sport only when the entity accepts a consideration for providing a location for that specific sporting activity. (We need not resolve the statute's application to a person who evades payment of the required fee but practices the specific sport for which the entity ordinarily receives compensation.)

That interpretation of the Ski Statute obviously applies as well to persons engaging in one of the winter sports listed in the statute even though it is not one of the sports for which the operator accepts a consideration. A business that charges a fee to use its cross-country ski trails is an operator with regard to cross-country skiers, but it is not an operator to others who may drive on its premises on motorized skimobiles, skate on its frozen lakes, or even slide down its hills on toboggans. In our view, the Legislature did not intend to impose a statutory duty on operators to post trail signs or remove hazards for sports foreign to the operator's business purpose. Similarly, no special assumption-of-risk immunity was provided to protect operators from suits filed by persons engaging in sports for which the operator receives no payment. Thus, if an operator accepts consideration only for downhill skiing, then only downhill skiers are "skiers" under the statute.

We recognize that the Ski Statute also provides that the term "skier" includes "any person in such ski area who is an invitee, whether or not said person pays consideration." *N.J.S.A.* 5:13–2(c). However, apart from that exception, New Jersey expressly limits the class of persons whose relationship is controlled by the Ski Statute to the "skier" who is on the land of another to practice a winter sport, and the "operator" who accepts payment for the privilege of practicing the sport in question. To hold that the Ski Statute governs the relationship between an operator of an area devoted to one sport, and a non-paying, non-invitee who practices a different sport, would frustrate that legislative scheme.

## B

With regard to its substantive aspects, New Jersey's Ski Statute is consistent with the general pattern of ski statutes elsewhere. Both skiers and operators are assigned specific duties. Chief among the duties assigned to skiers is that "[e]very skier shall maintain control of his speed and course at all times." *N.J.S.A.* 5:13–4(c). Furthermore, "[a] skier shall be the sole judge of his

ability to negotiate any trail, slope, or uphill track and shall not attempt to ski or otherwise traverse any trail, slope or other area which is beyond the skier's ability to negotiate." *N.J.S.A.* 5:13–4(d).

*N.J.S.A.* 5:13–5 is captioned "Assumption of risk of skier":

A skier is deemed to have knowledge of and to assume the inherent risks of skiing, operating toboggans, sleds or similar vehicles created by weather conditions, conditions of snow, trails, slopes, other skiers, and all other inherent conditions. Each skier is assumed to know the range of his ability, and it shall be the duty of each skier to conduct himself within the limits of such ability, to maintain control of his speed and course at all times while skiing, to heed all posted warnings and to refrain from acting in a manner which may cause or contribute to the injury of himself or others.

 The Ski Statute's list of inherent risks is illustrative, not exhaustive. In the skiing context, an inherent risk is one that cannot be removed through the exercise of due care if the sport is to be enjoyed. *See Schmitz v. Cannonsburg Skiing Corp.,* 170 *Mich.App.* 692, 428 *N.W.*2d 742, 744 (1988) (noting that if inherent dangers do not exist, "there is no skiing"). As the statement of legislative purpose indicates, the concept is intended to include those dangers that are "essentially impractical or impossible for the ski area operator to eliminate." *N.J.S.A.* 5:13–1(b). Although the Ski Statute provides that a skier's assumption of inherent risks raises a bar to suit for injuries that result from them, the general law of negligence has long recognized that a defendant has no duty with regard to such risks. *See Meistrich v. Casino Arena Attractions, Inc.,* 31 *N.J.* 44, 49, 155 *A.*2d 90 (1959) (noting that assumption of inherent risk "is an alternate expression for the proposition that defendant was not negligent").

 In contrast to their duties to post signs and warn of trail conditions, the operators' duty to remove "obvious, man-made hazards" is couched in general terms. It is apparent that obviousness must be considered from the perspective of operators, because it is on them that the duty is placed. Significantly, the reference to "obvious" hazards places a broader obligation on operators than would be the case if they were responsible only for

hazards of which they had actual knowledge. Clearly, an operator should know of obvious hazards on its mountain. Thus, there is an element of constructive notice in the Legislature's formulation of the operator's duty. The statute provides in the same section that

[n]o operator shall be liable to any skier unless said operator has knowledge of the failure to comply with the duty imposed by this section or unless said operator *should have reasonably known of such condition* and having such knowledge has had a reasonable time in which to correct [it].

[*N.J.S.A.* 5:13–3(d) (emphasis added).]

The Legislature incorporated the concept of foreseeability by specifying that an operator's duty extends to obvious hazards.

The duty to remove man-made hazards also casts a wide net. It excludes hazards that occur naturally on the mountain, that may be considered inherent to outdoor mountain sports and indeed form an integral part of their allure. Nonetheless, "[by] its nature, an alpine ski area is not a purely unaltered wilderness." Arthur N. Frakt & Janna S. Rankin, "Surveying the Slippery Slope: The Questionable Value of Legislation to Limit Ski Area Liability," 28 *Idaho L.Rev.* 227, 244 (1992). The placement of ski-lift towers, the use of artificial snow, and the layout of the trails all are man-made contributions to the skiing environment. Thus, for example, a jury could reasonably find that a tree left standing in the middle of a blind corner on a steep trail was an "obvious, man-made hazard," but that a tree was an inherent risk when it stood at the edge of a broad and straight fairway. We find that by restricting the duty of operators to man-made hazards, the Legislature has in large part simply restated the proposition that operators have no duty with regard to inherent risks of skiing.

The further limitation on the duty of operators, that obvious, man-made hazards need only be removed "as soon as practicable," confirms the conclusion that section 5:13–3(a)(3) is aimed at non-inherent hazards. Some man-made features of a ski slope are as inherent to the sport of skiing as the steepness of the mountain itself. One cannot have skiing without, for example, towers to support the ski lift. A danger that may feasibly be

removed, however, is not an inherent danger. A jury might properly find that a ski-lift tower placed where skiers might be expected to crash into it is a non-inherent, man-made risk if it could have been placed in a safer location.

▮ Such examples could be considered matters of ski-slope design, and some courts have held that hazards created by ski-slope design are inherent. *See Finnern v. Sunday River Skiway Corp.*, 984 *F*.2d 530, 535 (1st Cir.1993) (applying Maine law). We believe the better view is that design issues should be subjected to the same analysis as other risks. Thus, where a hazard resulting from a design flaw may be removed or eliminated, it is not inherent and, if obvious, the operator has a duty to remove it. *See White v. Deseelhorst*, 879 *P*.2d 1371, 1375 (Utah 1994) (holding that jury could find that placement of "cat track" intended to smooth traverse for novice skiers was unnecessarily dangerous and not an inherent risk); *Clover v. Snowbird Ski Resort*, 808 *P*.2d 1037, 1043–48 (Utah 1991) (holding that jury could conclude that blind jump in intermediate trail is not an inherent risk).

▮ Skiers may, of course, be injured in the course of breaching their statutory duty to ski in control by a hazard that is not inherent and which the operator was under a duty to remove. In that case, New Jersey's comparative negligence statute, *N.J.S.A.* 2A:15–5.1 to –5.8, will control, and the relative fault of the parties will be weighed to determine the injured party's ultimate recovery. *See N.J.S.A.* 2A:15–5.1. By turning to the doctrine of comparative negligence in those situations where the skier has voluntarily, but unwisely, encountered a risk that the operator could have removed, the Ski Statute has tracked the common law of negligence. *See Meistrich, supra*, 31 *N.J.* at 51–54, 155 *A*.2d 90 (explaining that assumption of risk is equivalent to contributory negligence when plaintiff is injured by hazard caused by defendant's negligence, the existence of which plaintiff knew or should have known and unreasonably decided to encounter).

To a significant extent, therefore, the operator's duty to "[r]emove as soon as practicable obvious, man-made hazards" and the skiers' assumption of inherent risks incorporate a rough restatement of general principles of negligence, as adapted to the context of skiing. The statutory standard does not necessarily mirror the common law. In some respects the balance has been shifted in favor of operators. For example, a danger that is foreseeable may fall short of being "obvious." Nonetheless, the analysis of liability under the Ski Statute and the analysis under the common law of negligence have significant parallels.

That fact, coupled with the Legislature's statements of intent, lead us to conclude that where the Ski Statute properly applies, the Legislature intended completely to displace the common law with regard to the statutorily defined parties. The Ski Statute was intended to "clearly define[ ] the responsibility of ski area operators." *N.J.S.A.* 5:13–1(b). The legislative committee statement stated as a primary concern the uncertainty over operator liability following Vermont's *Sunday* case. *See Committee Statement, supra.* That interest would have been poorly served had the Ski Statute merely supplemented the common law. By codifying, as modified, fundamental principles of negligence as they apply to skiers and ski-area operators, the Legislature provided certainty by occupying the entire field. *See* Jeffrey W. Lorell, "The New Ski Law: Are Downhill Injury Claims Headed Downhill?," 103 *N.J.L.J.* 197, 210 (March 8, 1979) ("The act does not exonerate a ski area ... but rather embraces a test for negligence traditionally established for this sport.... [I]t only makes explicit the inapplicability of comparative negligence in those situations where it would not apply in any event.").

III

Because the Ski Statute pre-empts the law of ski-area operators' liability, whether the statute is properly applied to a given set of facts becomes a critical threshold issue. We hold that the statute does not apply between these parties and that the trial

court erred in this regard. Defendant does not operate a tobogganing resort nor accept consideration from persons who wish to toboggan on its premises. Neither plaintiffs nor any other tobogganers tendered consideration for tobogganing and, if they had, presumably the consideration would have been refused and the tobogganers denied admission to the slopes. Under the terms of the Ski Statute, therefore, defendant was not an operator as to these tobogganers, plaintiffs were not skiers with regard to Great American, and the Ski Statute was inapplicable.

We hold, however, that defendant is barred by the doctrine of invited error from contesting that threshold issue. The doctrine of invited error operates to bar a disappointed litigant from arguing on appeal that an adverse decision below was the product of error, when that party urged the lower court to adopt the proposition now alleged to be error. The rule is based on considerations of fairness and preservation of the integrity of the litigation process. "Elementary justice in reviewing the action of a trial court requires that that court should not be reversed for an error committed at the instance of a party alleging it." *Bahrey v. Poniatishin*, 95 *N.J.L.* 128, 133, 112 *A.* 481 (E. & A. 1920).

Thus, where error was advanced to secure a tactical advantage at trial, the party responsible will not be permitted to complain on appeal. "The defendant cannot beseech and request the trial court to take a certain course of action, and upon adoption by the court, take his chance on the outcome of the trial, and if unfavorable, then condemn the very procedure he sought and urged, claiming it to be error and prejudicial." *State v. Pontery*, 19 *N.J.* 457, 471, 117 *A.*2d 473 (1955); *see Carrino v. Novotny*, 78 *N.J.* 355, 369, 396 *A.*2d 561 (1979) (holding that defendant who induced erroneous involuntary dismissal was bound by error and could not later contest amount of co-defendant's liability). Particularly where the parties appear to be in agreement on a difficult question of law, the trial court's reliance on the erroneous contentions of counsel is understandable, and it would be unfair to both the trial court and to the appellant's adversary to reverse. *See Terminal*

*Constr. Corp. v. Bergen County Hackensack River Sanitary Sewer Dist. Auth.,* 18 *N.J.* 294, 339, 113 *A.*2d 787 (1955); *Spedick v. Murphy,* 266 *N.J.Super.* 573, 593, 630 *A.*2d 355 (App.Div.) (holding that appellant could not object to admission of doctors' testimony where court and counsel all agreed that doctors could testify), *certif. denied,* 134 *N.J.* 567, 636 *A.*2d 524 (1993); *Venuto v. Lubik Oldsmobile, Inc.,* 70 *N.J.Super.* 221, 229, 175 *A.*2d 477 (App.Div. 1961) (holding party may not raise as plain error admission of evidence where party agreed to its admission at trial). The rationale is not far removed from that underlying the doctrine of waiver, in that counsel has deprived the court of the opportunity to make a correct ruling and the adversary of the ability to meet the objection. *See United States v. General Motors Corp.,* 226 *F.*2d 745, 750 (3d Cir.1955); *Vartenissian v. Food Haulers, Inc.,* 193 *N.J.Super.* 603, 610, 475 *A.*2d 626 (App.Div.1984).

The invited error doctrine has been applied in a wide variety of contexts, but it is particularly applicable where a party attempts to present a different theory on which to decide the case than the one advocated below. Thus it often has been held that a party may not argue that the jury was instructed to apply the wrong legal standard if that party argued for the application of that standard at trial. *Titus v. Lindberg,* 49 *N.J.* 66, 78, 228 *A.*2d 65 (1967); *Battenfeld v. Gregory,* 247 *N.J.Super.* 538, 548, 589 *A.*2d 1059 (App.Div.1991); *Skripek v. Bergamo,* 200 *N.J.Super.* 620, 632, 491 *A.*2d 1336 (App.Div.), *certif. denied,* 102 *N.J.* 303, 508 *A.*2d 189 (1985). There is no reason to hold differently when the jury is instructed to apply a statutory as opposed to a common-law standard. *See Fox v. Township of Parsippany–Troy–Hills,* 199 *N.J.Super.* 82, 89, 488 *A.*2d 557 (App.Div.), *certif. denied,* 101 *N.J.* 287, 501 *A.*2d 949 (1985); *Gilborges v. Wallace,* 153 *N.J.Super.* 121, 138–39, 379 *A.*2d 269 (App.Div.1977), *rev'd on other grounds,* 78 *N.J.* 342, 396 *A.*2d 338 (1978).

The record makes plain that the interpretation of the Ski Statute was vigorously contested before the trial court, as was the proper way to charge the Ski Statute to the jury. However, on

the issue of whether the Ski Statute applied at all, an issue that precedes questions concerning statutory interpretation or the parameters of the jury charge, counsel for Great American was adamant that it did. The trial court correctly identified the problem as a difficult one on these unusual facts, and struggled with its decision. Several times the court confirmed defendant's position, inquiring at one point: "You are all taking the position now that the Ski Statute applies?" Defense counsel replied: "I have never said that it didn't apply, Judge."

Admittedly, defendant's position was complicated by its argument that, under the Ski Statute, the jury should be charged to consider plaintiffs' common-law status as trespassers on the slope. That contention does not permit defendant now to disavow altogether its correlative claim that the statute applied. Defendant never asserted that the jury should not be instructed on the ski statute unless the jury was also instructed on plaintiffs' status as trespassers. Plaintiffs were willing to try the case under the Ski Statute, and did so to a successful conclusion. The trial court's reliance on the positions of counsel, while error, was certainly understandable, particularly given the lack of authority on the issue. Defendant succeeded in framing the controversy as turning on the correct interpretation of the Ski Statute. The fact that defendant's interpretation was rejected does not justify retrial on the theory that the Ski Statute never applied at all.

We also hold that, having been persuaded to apply the Ski Statute, the trial court and the Appellate Division correctly interpreted its provisions and, accordingly, the judgment below must be upheld. We believe that the trial court properly left to the jury the question of whether an obvious, man-made hazard existed, given the fact-intensive nature of this issue and its relation to the balancing of fault. *See Reisman v. Great Am. Recreation, Inc.*, 266 *N.J.Super.* 87, 97, 628 *A.*2d 801 (App.Div.) (holding that determination of whether drunken employee who collided with plaintiff was inherent risk was properly left to jury), *certif. denied*, 134 *N.J.* 560, 636 *A.*2d 519 (1993); *White, supra*, 879 *P.*2d

at 1375 (finding issue of fact regarding whether design hazard could have been alleviated); *Lopez v. Ski Apache Resort,* 114 *N.M.* 202, 836 *P.*2d 648, 656–57 (Ct.App.) (holding that whether ski-lift tower was inherent risk presents question of fact), *cert. denied,* 113 *N.M.* 815, 833 *P.*2d 1181 (1992); *Clover, supra,* 808 *P.*2d at 1045 (stating that whether risk is inherent is case-by-case determination).

We find that the jury charge correctly directed the discretion of the jury and that the record provides ample support for its findings. Unquestionably, the parking lot and the utility pole were man-made. Furthermore, the jury properly could have considered the position of those obstacles at the bottom of the slope as part of the slope's design, and whether the limited flat area for tobogganers to come to a stop constituted an additional man-made element of the hazard. The fact that there was no showing that the flat area of the Bunny Buster slope was hazardous for persons on skis could not have precluded a finding that it was a hazard for persons on toboggans. In addition to the obvious fact of plaintiffs' injuries, there was ample expert testimony on the danger of tobogganing on the Bunny Buster.

Having been instructed that plaintiffs were skiers for purposes of the Ski Statute, and given the evident peril of tobogganing on the Bunny Buster, the jury could consider evidence that Great American was aware of the presence of tobogganers on its slopes in assessing the "obviousness" of the hazard. The inviting aspect of the Bunny Buster, illuminated at night when the ski lift was not operating, and the presence of other tobogganers apparently without interference from Great American were signals to plaintiffs that tobogganing was at least tacitly approved and safe and could also support the inference that defendant should have been aware of plaintiffs' presence. *See McLaughlin v. Rova Farms, Inc.,* 56 *N.J.* 288, 304, 266 *A.*2d 284 (1970) (stating that presence of platform over water at swimming resort constituted invitation to dive and implied representation that diving was safe); *cf. Harrison v. Middlesex Water Co.,* 158

*N.J.Super.* 368, 376–78, 386 *A.*2d 405 (App.Div.1978) (dismissing claim against municipal landowner by skaters who fell through ice for, among other reasons, lack of evidence of constructive notice to police of plaintiffs' presence on the ice or that plaintiffs relied on police failure to order them off the ice in assuming that ice was safe), *rev'd on other grounds,* 80 *N.J.* 391, 403 *A.*2d 910 (1979). The proximity of the condominium development to the ski resort and the mutual benefit the two enterprises derive from each other's presence also would have been legitimate factors for the jury to consider in assessing whether it was obvious to Great American that its customers and others would venture onto the slopes for sledding or tobogganing after the lifts shut down for the night. Finally, the jury reasonably could have determined that Great American should have been aware that tobogganers using the Bunny Buster hill would confront a hazardous condition posed by the configuration of the hill and the adjacent parking area.

 Turning to whether the hazard was inherent or whether it might practicably have been removed, the jury could have considered whether it was appropriate to locate the parking lot and the utility pole so close to the bottom of the hill or whether they could have been relocated and the flat area at the bottom of the hill extended. Defendant argued that the parking lot was not within Great American's control, but the jury could reasonably have discounted this claim. Nor need the jury have found that such drastic safety measures should have been undertaken. More efficient security patrols, or, as the Appellate Division recognized, a sign warning that tobogganing was unsafe on the Bunny Buster, might have reduced the hazard and thus "removed" it for the purposes of the Ski Statute. Thus the jury had ample grounds to find that the hazard was not inherent.

 The jury could properly have weighed all of these factors to find that there was an "obvious, man-made hazard" that defendant could have removed, but did not. Except for the trespasser issue and some minor points not preserved on appeal, defendant did not object to the jury charge, and indeed argued for the

instruction that a breach of a statutory duty was the equivalent of negligence. Concerning the plaintiffs' statutory duties, it cannot reasonably be contested that they breached their duties to maintain control and not to attempt a slope beyond their abilities. The jury's verdict, holding Great American 54% and plaintiffs 22% at fault was a reasonable one on the record of this case.

## IV

We would not apply the doctrine of invited error where to do so would cause a fundamental miscarriage of justice. That exception to the doctrine has been explicitly recognized in criminal matters, *e.g., State v. Ramseur,* 106 *N.J.* 123, 281–82, 524 *A.*2d 188 (1987) (quoting *State v. Harper,* 128 *N.J.Super.* 270, 278, 319 *A.*2d 771 (App.Div.) (Handler, J.A.D.), *certif. denied,* 65 *N.J.* 574, 325 *A.*2d 708 (1974)), but we are satisfied that, in the unusual case, it may apply in civil proceedings as well. *See Ferry v. George Settle, Fischer Baking Co.,* 6 *N.J.* 262, 78 *A.*2d 264 (1951) (ordering new trial for several joint tortfeasors, including those who caused error complained of, where to do otherwise might result in those defendants bearing entire burden of plaintiff's damages). It has been held that invited error will not be grounds for reversal on appeal, even though it would otherwise be cognizable as plain error affecting substantial rights of the appellant. *Schult v. H. & C. Realty Corp.,* 53 *N.J.Super.* 128, 136, 146 *A.*2d 698 (App.Div.1958), *certif. denied,* 29 *N.J.* 279, 148 *A.*2d 894 (1959). We need not determine here the quantum of prejudice that would justify relaxing the invited error rule, because we are convinced that, in this case, the verdict would have been the same had the common law been charged.

We cannot agree with defendant that plaintiffs, as trespassers, were owed no more than a duty to refrain from willfully injuring them. It is settled that the common-law classifications of persons on land should be applied flexibly in assessing the landowner's general tort obligation to avoid foreseeable harm to others. *Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 438–39,

625 *A*.2d 1110 (1993); *Butler v. Acme Markets, Inc.*, 89 *N.J.* 270, 275–77, 445 *A*.2d 1141 (1982). Landowners owe a higher duty even to trespassers when their presence is foreseeable, *see Snyder v. I. Jay Realty Co.*, 30 *N.J.* 303, 312, 153 *A*.2d 1 (1959); *Imre v. Riegel Paper Corp.*, 24 *N.J.* 438, 444–45, 132 *A*.2d 505 (1957), particularly if an artificial condition or "dangerous instrumentality" on the land poses a danger to them. *Renz v. Penn Central Corp.*, 87 *N.J.* 437, 462, 435 *A*.2d 540 (1981); *Imre, supra,* 24 *N.J.* at 445, 132 *A*.2d 505; Restatement (Second) of Torts § 337 (1965) (setting forth rule of liability for "Artificial Conditions Highly Dangerous to Known Trespassers"). We need not struggle to place plaintiffs within one or another of the common-law classifications, nor need we determine whether the technical elements of the dangerous instrumentality rule are satisfied. The issue is whether, "in light of the actual relationship between the parties under all of the surrounding circumstances," the imposition of a duty on the landowner is "fair and just." *Hopkins, supra,* 132 *N.J.* at 438, 625 *A*.2d 1110; *see Wytupeck v. City of Camden,* 25 *N.J.* 450, 460, 136 *A*.2d 887 (1957) ("[T]he common law raises a 'public duty' of care commensurate with the risk of harm."); *Imre, supra,* 24 *N.J.* at 443, 132 *A*.2d 505; *Strang v. South Jersey Broadcasting Co.,* 9 *N.J.* 38, 45, 86 *A*.2d 777 (1952) ("The basis of liability is the foreseeability of harm, and the measure of duty is care in proportion to the foreseeable risk.").

In our view, the duty defendant owed to plaintiffs under the common law would, at a minimum, have encompassed a duty to remove obvious, man-made hazards as soon as practicable. To the extent that the duty owed to plaintiffs would be influenced by their status on the land, factors such as the presence of other tobogganers and sledders on the Bunny Buster, the mutual advantage derived by Stonehill and Great American by their proximity to each other, the inviting character of the illuminated slope, and the other indicia of the foreseeability that plaintiffs would decide to toboggan there would properly have been considered. The obviousness to defendant of the danger, its gravity, and whether plaintiffs' were able to perceive the risk to themselves also would

have been considered by the jury in deciding whether the slope constituted a dangerous instrumentality.

We have already noted the parallels between the analyses of liability under the Ski Statute and under general principles of negligence. The same facts are relevant under both standards. To the extent the two standards differ, we perceive that defendant may have been benefitted rather than harmed by the error in applying the Ski Statute. For example, the jury instruction that an obvious danger was "easily discovered, easily seen, easily understood, is something that is plain, patent, apparent, evident, clear, or manifest," stated a higher and more restricted standard of foreseeability than would properly have been charged under general, common-law principles. In any event, any prejudice to defendant occurring by virtue of the trial court's application of the Ski Statute with defendant's acquiescence was insufficient to require reversal.

V

For the foregoing reasons, the judgment is affirmed.

*For affirmance*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.